# EXHIBIT 2
# Part 1 of 2

1   JESSE HERNANDEZ (K-21116)
    GW-104-Up , CTF-SOLEDAD (CENTRAL)
2   P.O. BOX 689
3   SOLEDAD , CA  93960 -0689
4       (IN PRO PER)

5

6

7

8       IN  THE  SAN  DIEGO  COUNTY  SUPERIOR  COURT

9       IN  AND  FOR  THE  STATE  OF  CALIFORNIA

10

11

12

13  IN RE JESSE HERNANDEZ ON H.C.
14      (JESSE  HERNANDEZ - PETITIONER)    CASE NO.

15          — V —                    RE8 PETITION  FOR  WRIT
16  B.CURRY  —  Warden ,et al.         OF  HABEAS  CORPUS
17      (RESPONDENT )           (EVIDENTIARY HEARING REQUESTED)

18

19

20

21

22

23

24

25

26

27

28                      - 1 -

TABLE OF CONTENTS

1  

2  COVER PAGE _____ i

3  TABLE OF CONTENTS _____ ii

4  TABLE OF AUTHORITIES _____ iii - iv

5  MC275 FORM FOR HABEAS CORPUS _____ 1-26

6     (VERIFICATION PAGE) _____ ( 26 )

7  AMENDMENT/SUPPLEMENT TO HABEAS CORPUS_____ 27-56

8     (INTRODUCTION) _____ ( 27 )

9     (JURISDICTION) _____ ( 28 )

10    (VENUE) _____ ( 28 )

11    (PARTIES) _____ ( 28 )

12    (FACTS : INCORPORATED BY REFERENCE) _____ ( 28 )

13    (MEMORANDUM OF POINTS AND AUTHORITIES)_____ (29-54 )

14    (CONCLUSION) _____ ( 55 )

15    (PRAYER FOR RELIEF) _____ ( 56 )

16  

17                    EXHIBITS

18  "A": 2006 PAROLE HEARING TRANSCRIPTS (pages i,ii , 1-74 )

19  "B": BPT 1005(b) FORM WITH RECOMMENDATIONS ( p. 1/1 )

20  "C": CDC 128's _____ (p.1/4 - 4/4)

21  "D": POSITIVE WORK REPORTS (1998-2006) _____ ( p.1/15 - 15/15)

22  "E": CDC 115 WITH CREDITS RESTORED AS NOTED ___(p. 1/1 )

23  "F": AMENDED PSYCH REPORT and other documents __(p.1/4 - 4/4)

24  VERIFICATION/PROOF OF SERVICE BY MAIL _____ 8 LAST

25                              [TOTAL PAGES 168 ]

26  

27  

28                    - ii -

## TABLE OF AUTHORITIES                              PAGE(S)

### U.S. CONST.

Amend. 1 "establishment" clause _____ 48
Amend. 14 "due process" clause _____ passim
Amend. 5 "witness against self" clause _____ 33

### Federal Case Law

Arkansas -v- Oklahoma (1992) 112 S.Ct. 1046, 1060, 503 US 592 __ 43
Biggs -v- Terhune (CA9 Cal. 2003) 334 F.3d 910, 2003 DJDAR 8863 __ 54
Cafeteria Workers -v- McElroy (1961) 367 US 886, 81 S.Ct. 1743 ____ 34
County of Sacramento -v- Lewis (1998) 118 S.Ct. 1708, 1716, 523 US 833 _ 37
Daniels -v- Williams (1986) 106 S.Ct. 662, 665, 474 US 332 ____ 31
Evitts -v- Lucey (1985) 105 S.Ct. 830, 838-39, 469 US 388 _____ 53
F.P.C. -v- Transcontinental Gas Pipe Line (1976) 96 S.Ct 579, 582 __ 39
Gillette -v- United States (1971) 91 S.Ct. 828, 836 _____ 48
Greenholtz -v- Inmates of Neb. ...(1979) 442 US 1, 15, 99 S.Ct. 2100 _ 40
Groppi -v- Leslie (1972) 404 US 496, 30 L.Ed.2d 632, 92 S.Ct 582 _____ 34, 54
Hamdi -v- Rumsfeld (2004) 542 US 507, 530, 124 S.Ct. 2633 _____ 31
Irons -v- Warden of C.S.P. - Solano (E.D.Cal. 2005) 358 F.Supp. 2d 936, 942 _ 34, 44
Lee -v- Weisman (1992) 505 US 577, 587, 112 S.Ct. 2649, 120 L.Ed 2d 1467 _ passim
Liteky -v- U.S. (1994) 114 S.Ct. 1147, 1155, 510 US 540 _____ 49
Martin -v- Marshall (N.D.Cal. 2006) ___ F.Supp. 2d ___ (2006 WL 1344584) _ 42
Morrissey -v- Brewer (1972) 408 US 471, 481, 92 S.Ct. 2593, 2600 ____ 32
Newman -v- Apfel (9th Cir. 2000) 223 F.3d 937, 943 _____ 47
N.L.R.B. -v- Askenazy Property Management Corp. (CA9 1987) 817 F.2d 74 __ passim
Schweiker -v- McClure (1982) 456 US 188, 72 L.Ed 2d 1, 102 S.Ct. 1665 _ 51
Sinaloa Lake Owners Assn -v- City of Simi Valley (9th Cir. 1989)
    (882 F.2d 1398, cert. den. 494 US 1016, 110 S.Ct 1317, (1990)) ____ 51, 52
Spraic -v- U.S. R.R. Retirement Bd. (CA9 1984) 735 F.2d 1208 _____ passim
Stivers -v- Pierce (9th Cir. 1995) 71 F.3d 732, 748 _____ 36, 52
Superintendent ...-v- Hill (1985) 105 S.Ct. 2768, 472 US 445 _____ 29
Thompson -v- Davis (CA9 Cal. 2002) 295 F.3d 890, 898 _____ 46
Turner -v- Hickman (E.D.Cal. 2004) 342 F.Supp 2d 887 _____ passim
Tyson -v- City of Sunnyvale (N.D.Cal. 1996) 920 F.Supp. 1054, 1063 _ 52
Walters -v- Nat. Assn. of Radiation Survivors (1985) 473 US 305,
    (87 L.Ed 2d 220, 105 S.Ct. 3180, 3189) _____ 35
Withrow -v- Larkin (1975) 421 US 35, 95 S.Ct. 1456, 43 L.Ed 2d 712, 728 _50
United States -v- Caceres ( ) 59 L.Ed 2d 733, 743 fn 14, 440 US 741 _____ 95

1    TABLE OF AUTHORITIES CONT.                    PAGE(S)

2    O'Bremski -v- Maass (9th Cir. 1990) 915 F.2d 418, 422 _____ 49
3    Howlett By and through Howlett -v- Rose (1990) 110 S.Ct. 2430, 2438 — 54
         California Case Law
4    In Re John E. Dannenberg (2005) 34 Cal.4th 1061
5       (23 Cal. Rptr. 3d 417) _____ 30
     In Re De Luna (Cal. App. 6th Dist. 2005) 29 Cal. Rptr. 3d 643, 649-50 — 30,31
6    In Re Eduard Ramirez (Cal. App. 1st Dist 2001) 114 Cal. Rptr. 2d 381 ___ 53,54
7    In Re Rosenkrantz (2002) 128 Cal. Rptr. 2d 104, 138, 29 Cal. 4th 616 — 29
     In Re George Scott (Cal. App. 1st Dist. 2004) 119 Cal. App. 4th 871,
8       (15 Cal. Rptr. 3d 32) _____ 33
9    In Re Earnest Smith (Cal. App. 6th Dist. 2003) 114 Cal. App. 4th 343, 371,
        (____ Cal. Rptr. 3d ____ ) _____ 46
10   In Re Mark Smith (2003) 109 Cal. App. 4th 489, 505,
11      (134 Cal. Rptr. 2d 781, 792) _____ 46
     Galland -v- City of Clovis (Cal. 2001) 103 Cal. Rptr. 2d 711, 24 Cal. 4th 1003 — 35
12   Haas -v- County of San Bernardino (Cal. 2002) 119 Cal. Rptr. 2d 341, 346, 356 — 35,36
13   People -v- Cluff (Cal. App. 1st Dist. 2001) 105 Cal. Rptr. 2d 80, 83 ____ 31
     Terhune -v- Sup. Ct. (Whitley) (1998) 65 Cal. App. 4th 864, 872 _____ 30
14   Walsh -v- Kirby (1974) 118 Cal. Rptr. 118, 13 Cal. 3d 95, 529 P.2d 33 ___ 47
15

16         Calif. Statutes
     §2932(d) [Penal Code] _____ 41
17   §2932(e) [Penal Code] _____ 41
     §5011(b) [Penal Code] _____ 32,33,49
18        California Code of Regulations
19   §2236 _____ 33
     §2400 et seq _____ passim
20   §2402 (c)(1) _____ 30
     §2402 (c)(1)(A) _____ 30
21   §2402 (c)(1)(E) _____ 32
     §2402 (c)(5) _____ 43
22   §2402 (c)(6) _____ 36,40
     §2402 (d)(9) _____ 36,41
23   §2410 (c)(2) _____ 38
     §2402(b) _____ 43
24   §3040 _____ 38
     §3041 _____ 38
25   §2402(a) _____ 44
     §2250 _____ 51
26

27         OTHER
     64 OPS Cal. Atty. Gen. D76 (1981 WL 126813) _____ 41,42
28                    -iv-

MC-275

Name  JESSE HERNANDEZ

Address  GW-104-Up, CTF-Central

_____  P.O. Box 689

_____  Soledad, CA  93960 -0689

CDC or ID Number  K-21116

## SAN DIEGO COUNTY SUPERIOR

## FOR THE STATE OF CALIFORNIA
(Court)

IN RE JESSE HERNANDEZ

| JESSE HERNANDEZ | |
|---|---|
| Petitioner | |
| vs | |
| B. CURRY    Warden et al | |
| Respondent | |

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

(To be supplied by the Clerk of the Court)

(EVIDENTIARY HEARING REQUESTED)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005] Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

☐ A conviction                    ☒ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☒ Other: (specify) Unconstitutional Denial of Parole violating Procedural Due Process

1. Your name: JESSE HERNANDEZ

2. Where are you incarcerated? CORRECTIONAL TRAINING FACILITY - SOLEDAD (CENTRAL FACILITY)
   HWY 101 5 mi N. of Soledad, P.O. Box 689, Soledad, CA 93960-0689

3. Why are you in custody? ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      Attempted Murder w/ premeditation + other factors

   b. Penal or other code sections: Pen. Code §§ 187 / 664

   c. Name and location of sentencing or committing court: San Diego County Superior Court

   d. Case number: SCE 167745

   e. Date convicted or committed: _____

   f. Date sentenced: _____

   g. Length of sentence: 7-to-life

   h. When do you expect to be released? UNDETERMINED AS TERM-TO-LIFE PRISONER

   i. Were you represented by counsel in the trial court? ☒ Yes.   ☐ No.  If yes, state the attorney's name and address:

      William Trainer

4. What was the LAST plea you entered? *(check one)*

   ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four  For additional grounds, make copies of page four and number the additional grounds in order.)*

Petitioner contends the holding of Superintendent ... v. Hill (1985) 472 US 445, 105 S.Ct. 2768 was violated when parole denied by use of factor of non-applicable circumstance of unsuitability; thus, it was arbitrary and capricious to manipulate regulatory restriction contrary to liberty interest in fundamental fairness.

a. **Supporting facts:**

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at *what time (when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

(1) At Petitioner's Initial Parole Hearing (I.P.H. hereafter), he was denied parole suitability. The Official Record of the I.P.H. is in the I.P.H Transcripts ( I.P.H. Tx's) — EXH "A"s

(2) The First reason for parole denial was: "That is, First there are multiple victims in separate incidences." — EXH "A" p.65 ℓ 14-15

(3) The one and only circumstance/factor for parole unsuitability as related to multiple victims is in CCR § 2402 (c)(1)(A); and only to support CCR§2402(c)(1)

(4) The Board of Parole Hearings only has jurisdiction over indeterminate sentences, and Petitioner's term-to-life

\* Note: Ground #1 Facts continued at page  4

b. **Supporting cases, rules, or other authority (optional):**

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Ground #1 Points and Authorities at page: 29, 30, 31

Ground #1  Facts Continued:

(#4 cont.)

sentence for Attempted Willful, Deliberate and Premeditated Murder did not involve more than 1 victim.

(5) The record before the Parole Board only shows the minimum acts necessary to convict, and to this date Petitioner still maintains his innocence.

(6) Nowhere in the record before the Board, in order to support the commitment offense as especially heinous, atrocious or cruel were (1) Multiple victims attacked; (2) Multiple victims injured; or (3) Multiple victims killed.

4

7   Ground 2 ▮▮▮▮▮▮▮▮▮▮    (if applicable)

Petitioner contends that the use of "motive" to deny parole
violated the Morrissey -v- Brewer (1972) 408 US 471, 481, 92 S.Ct.
2593 holding that procedural protections be followed
which the situation demands.

a   Supporting facts:

(1) According to the I.P.H. Tx's ( EXH "A"), the
    Second reason for parole denial was a
        "The motive of this crime remains inexplicable
         in that we still don't have a clear understanding
         of why these crimes occured, except for Mr.
         Hernandez's desire to control Ms. Wolf." -
    EXH "___" p.65 l 18-22.

(2) There is no evidence in the record to establish
    anything more than the minimum elements
    to convict of the term-to-life offense. As
    Petitioner is not admitting/stipulating to any guilt,
    he proffers that as convicted there is not one iota of
    evidence to prove that the crime occurred in
    any manner in which to be "especially heinous,
    atrocious, or cruel" within the meaning of
    CCR§2402(c).

(3) "Motive", as a parole unsuitability factor is listed

* Note: Ground #2 Facts continued at page  6

b.  Supporting cases, rules, or other authority

Ground #2 Points and Authorities at pages 32,33,34

1  GROUND #2 FACTS CONTINUED:

2  (P.3 cont.)

3       in CCR §2402 (cc) (1)'s factors to support the

4  "especially heinous, atrocious, or cruel" circumstance

5  in #(E).

6  (4) As a now final decision by the Board of

7  Parole Hearings, they never even alleged the

8  Commitment offense as "especially heinous",

9  "especially atrocious", "especially cruel" and

10 in fact did not point to any fact about the

11 commitment offense which made him not

12 suitable for parole.

13 (5) Notwithstanding the aforementioned, the panel

14 substantiated an explanation, in an intelligible

15 manner: "[E]xcept for Mr. Heanandez's desire to

16 control Ms. Wolf." Presuming, without admitting

17 the conclusiveness of this rationale: the Board's

18 own statement is opposite their CCR§2402(c)(1)(E)

19 parameter.

20 (6) Petitioner's lawyer, see EXH "A" p.4 L18-26:

21      "He will not be discussing the offense...

22      So he won't be discussing the facts and

        circumstances around the allegations.

23      as they came up back in 1995."

24 (7) Forcing Petitioner to explain motive violates

25 his rights under Pen.Code §5011.

26

27

28

7. ▬▬▬▬Ground _3_ (if applicable):

Petitioner contends that the Board's conclusion about limited program is a denial of the "Fundamental Fairness" doctrine as upheld in Walters -v- Nat. Assn. of Radiation Survivors (1985) 473 US 305, 105 S.Ct. 3180, 3189.

a. Supporting facts:

(1) According to the I.P.H. TX's (EXH "A"), the THIRD reason for parole denial was "The prisoner has, in terms of institutional behavior, programmed in a limited manner while incarcerated." - EXH "A" p.65 l 22-24.

(2) Regarding the "institutional behavior" analysis, the Board's authority extends to CCR§ 2402 (c)(6) for unsuitability and CCR§ 2402 (d)(9) for suitability.

(3) Petitioner has no Serious Disciplinaries during the time since his life term began.

(4) In EXH "A" p.10 l 18-26 and p.11 l 1-4, the Board acknowledges chronos.

(5) The B.P.H. panel even read into the record an extensive history of program - See EXH "A" p.36 l 27 through p.39 l 13.

(6) Petitioner is effectively a 7-to-life prisoner due to

* Note: Ground #3 Facts continued at page _8_

b. Supporting cases, rules, or other authority:

Ground #3 Points and Authorities at pages 35, 36

GROUND #3 FACTS CONTINUED:

(P 6 cont.)

immediate conviction. Clearly, he wouldn't have as much PROGRAM as a 15-to-life or 25-to-life PRISONER.

(7) Petitioner has developed marketable skills that can be put to use upon release.

(8) The B.P.H. panel pointed to no lack of PROGRAM that makes Petitioner an unreasonable risk to society if released.

(9) On 3/27/06 (EXH "B") the Board panel only checked the box for Get self-help/Earn positive Chronos and stay discipline free.

(10) Petitioner had prior self-help (Ground 4 infra) and was currently in programs/awaiting programs at time of hearing.

(11) Petitioner has never received any Prison Disciplinary under: CCR § 3314 (a)(3)(G)'s "Failure to meet work or PROGRAM expectations within the inmates abilities; CCR § 3315 (a)(3)(J)'s "Refusal to perform work or participate in a PROGRAM as ordered or assigned"; or CCR § 3315 (a)(3)(K)'s "Recurring failure to meet work or PROGRAM expectations within the inmates abilities when lesser disciplinary methods failed to correct the misconduct."

8.

7. ▓▓▓▓▓Ground __4__ (if applicable):

Petitioner contends that the B.P.H.'s unsuitability rationale that the record shows "you have not participated in beneficial self-help programs" [Emphasis Added] is an abuse of power by being arbitrary as held in County of Sacramento v Lewis (1998) 118 S.ct. 1708,1716, 523 US 833.

a. Supporting facts:

(1) According to the I.P.H. Tx's (EXH "A"), the fourth reason for parole denial was: " That you have not participated in beneficial self-help programs." - EXH "A" p. 66 l 2-3

(2) The only known section of the Board's regulations that define Self-Help and Rehabilitative Programs is CCR § 2410 (c)(2) dealing with post-conviction credit.

(3) Petitioner only has to disprove the Board's finding of "not participated in beneficial self-help programs" [Emphasis Added]

(4) In the record before the B.P.H. panel ; See EXH "A":
  p. 37 l 10 - 27 through p. 38 l 16 — programs
  p. 40 l 16 - 26 through p. 41 l 11-16 — programs
  p. 50 l 1-9                           — programs
  p. 37 l 1-9                           — assignments
  p. 38 l 18-23                         — assignments

* Note: Ground #4 Facts continued at page __10__

b Supporting cases, rules, or other authority:

Ground #4 Points and Authorities at pages 37,38,39.

1  GROUND #4 FACTS CONTINUED:

2  (P 4 cont.)

3        P.38 l 26 through p.39 l 13        – assignments

4  (5) Paragraph (4) of Ground 4 disproves the Board's

5      conclussery allegation about "not participated in

6      beneficial self-help programs."

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7 ~~Seventh~~ Ground __5__ (*if applicable*)·

Petitioner contends that the use of a 7 + 8 year old prison disciplinary is beyond the scope of B.P.H.'s authority, of this disciplinary as a parole unsuitability factor, in light of Greenholtz-v-Inmates of Neb. Penal and Corr. Complex (1979) 442 us 1, 15, 99 S. Ct. 2100 and restoration of credits lost by another agency.

a Supporting facts

(1) According to the I.P.H. Tx's (EXH "A"), the FIFTH reason for parole denial was:

"There was one serious disciplinary action, a 115, in Febeuary of 1998 for Mutual Combat." — EXH "A" p. 66 l 3-5.

(2) This one Serious Disciplinary occurred during Petitioner's determinate term prior to his indeterminate term.

(3) Although Petitioner lost 90 days of Credit, his behavior was such that on 12/3/98 the Unit Classification Committee restored all credits lost. [EXH "E" note.]

(4) Notwithstanding the Board's "Decision" statement in Gnd. 5 A (1), supra:

"You have had an exceptional disciplinary history. Since you have been in custody you have had no CDC 128 (a)s and only one CDC 115 ... But certainly your having only one 115 in nearly 10 years is

* Note: Ground # 5 Facts continued at page __12__.

b. Supporting cases, rules, or other authority

Ground #5 Points and Authorities at pages ~~40~~41.~~42~~.

GROUND #5  FACTS CONTINUED:

(P 4 cont.)

something that you're to be congratulated for. And we don't say that in any kind of mild way, we're sincere." — EXH "__A__" p.36 l11-25

(5) The record before the panel, including their own statements and including facts associated with Grounds 3 and 4, show how Petitioner has shown an enhanced ability to function within the law upon release.

(6) At the beginning of the decision (EXH "__A__" p.65) the Board's panel concluded that Petitioner posed an "unreasonable risk of danger to society or a threat to public safety if released". They then listed the 115 during their litany of unsuitability rationale.

(7) Where the B.P.H. lacks any authority to deny credits based on a CDC 115 that is outside their scope of punishment factors, it should not have been in the list of unsuitability criteria.

(8) Petitioner received his credits back, and the Board refused to modify the decision according to law during the review period.

7 ▮▮▮▮▮ Ground  6  *(if applicable)*

Petitioner contends that the B.P.H.'s use of Psych Report that was
known to be inaccurate (affecting Risk Assessment), as a parole
unsuitability circumstance, and which was modified to a lower
assessment prior to Finality of Decision, violated Due Process guarantee
to fair decision as held in Arkansas' -v- Oklahoma (1992) 112 S.Ct. 1046, 503 US 592.

a Supporting Facts:

(1) According to the I.P.H. Tx's (EXH "A"), the
    SIXTH reason for parole denial was:
    "The psychiatrist's report dated 1/20/06 by
    Laura Petracek is not totally supportive
    in that it indicates that within a controlled
    setting his risk is minimal compared to the
    average inmate. IF released into the
    community his violence risk is slightly
    higher compared to the average citizen."

(2) Nowhere in the Psychiatrist's report was there
    any conclusion that release would make Petitioner
    an unreasonable threat of danger to society if
    released. (Compare CCR § 2402 (c)(5) "Psychological Factors....")

(3) In EXH "A" p. 13 l 22 - p. 14 l 8 the Board was
    put on notice about errors in the Psych Report
    being corrected via Administrative Remedy process.
    However, the Board chose to hold the hearing anyway.

* Note: Ground # 6 Facts continued at pages 13, 14.

b  Supporting cases, rules, or other authority:

Ground # 6 Points and Authorities at pages 13, 14.

1  GROUND #6 FACTS CONTINUED:

2  (4) Further, EXH "_A_" p. 13 l 5-20 explains the

3      importance of psychologist report.

4  (5) In EXH "_A_" p. 42, the Board then entered into

5      the record the facts of the evaluation.

6  (6) Petitioner's lawyer then attempted to correct

7      the record in regards to the Psych Report (EXH "_A_"

8      p. 43 l 21-27 and p. 44 l 1-22). His lawyer then explained

9      the problems with the inaccuracies further (EXH "_A_"

10     p. 45 l 16-27 to p. 47 l 7). Also, Counsel for Petitioner

11     established for the Board that Dr. Zika was aware

12     of the problems and was trying to get them

13     corrected (EXH "_A_" p. 59 l 25-27 and p. 60 l 1-2).

14  (7) After reading the "Decision" (EXH "A" pp. 65 - p. 69 l 7)

15     the Board Panel stated:

16        "Counsel did note errors in the psychological

17        report. The panel has taken note of those errors

18        and has asked for a new psychological evaluation

19        to clear up any inconsistencies that might be

        there." - EXH "A" p. 69 l 7-12

20  (8) Thus, the Board held a hearing knowing about

21     inaccuracies in the evaluation and used the

22     evaluation to deny parole anyway.

23  (9) Petitioner's Board Hearing occurred 3/26/06 according

24     to the record. It was not final until July 24, 2006.

25     In actuality, it occurred 3/27/06. On April 26, 2006, the

26     new Addendum to the Psych Report was written. Given

27     Petitioner on 5/1/06: "He does not appear to impose any

28  more risk to society than the average citizen."

14

GROUND # 6 FACTS CONTINUED:

(10)  In EXH "_A_" p.64, Petitioner requested an
      en banc panel to review the record:
         "I further ask that this case go to the
         en banc review before transcript finality
         date." - lines 5-7.

(11)  As the Board is obligated to have the transcripts
      done in 30 days after hearing (Pen. Code 83042(b)),
      they could have shown that the record was
      amended before finality in order to show
      risk assessment was not correct.

(12)  Now, where the parole hearing transcripts are
      part of the public record, where left uncorrected
      the Information Procedures Act has been violated.
      Also, the public record contains erroneous information.

(13)  The Board refused to postpone the hearing for a new
      report which evinces predetermined outcome to
      deny parole.

(14)  At each/every hearing the Board is to consider
      _all_ relevant and reliable information. Here,
      the Board considered and cited to irrelevant and
      unreliable information (Psych Report).

15

7 ~~XXXX~~ Ground __7__ (if applicable)

Petitioner contends that the B.P.H.'s use of his prior alcohol and substance abuse is a violation of Due Process, due to the failure to follow its own procedures (judicially determined) and therefore in violation of United States v. Caceres ( ) 59 L Ed 2d 733, 743 Fn. 14, 440 US 741, 99 S. Ct. 1465

a   Supporting facts:

(1) According to the I.P.H. Tx's (EXH "__A__"), the SEVENTH reason for parole denial was:

   "And significant risk factors and precursors to violence are his past alcohol and substance abuse and a relapse would increase his risk of violence or undo gains he has made." - EXH "__A__" p. 66 l 11-15

(2) Petitioner's prior alcohol use is an unchanging factor.

(3) Petitioner's prior substance abuse is an unchanging factor.

(4) There is no evidence in the record that Petitioner is presently addicted /using alcohol or drugs.

(5) In EXH "__A__" p. 54 l 18-24, Petitioner even has plans for sober living.

(6) The Board used this circumstance, as quoted from Dr. Petracek's Assessment: it is easier addessed as a seperate ground so as to show how individually invalid.

* Note: Ground #7 Facts continued at page __47__.

b.  Supporting cases, rules, or other authority

Ground #7 Points and Authorities at pages 45,46,47.

1 | GROUND #7  FACTS CONTINUED:

2 | (7) Notwithstanding the current record of the Board's transcripts,

3 | the evidence at trial was entirely devoid of any facts which

4 | would substantiate the commitment offense was related

5 | to alcohol or controlled substances.

6 | (8) Even the probation report doesn't show that either

7 | alcohol or controlled substance(s) as being a contributing

8 | factor.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

7 ~~▆▆▆▆~~ Ground **8** *(if applicable)*

Petitioner contends that the B.P.H.'s conclusion that "he still denies any responsibility for his crime" is a predisposition reflecting inability to render fair judgement (due to needed "soul-searching") as held violative of Due Process in *Liteky -v- U.S.* (1994) 114 S.Ct.-1147, 1155, 510 US 548 as it equates to "bias" or "prejudice".

a. Supporting facts:

(1) According to the I.P.H. TX's (EXH "A"), the EIGHTH reason for parole denial was:
   "Although he has been disciplinary-free since his incarceration he still denies any responsibility for his crime and this evaluator feels that the inmate needs to do some soul-searching before being considered for release." - EXH "A", p. 66 l 15-20

(2) Petitioner does not have to admit guilt, which should include, minimally, any actions perceived/calculated to imply guilt.

(3) "Soul-searching" is to vague as to have meaning, and some is a total that is undecipherable. Minimally, it has religious connotations.

(4) "Soul-searching" is not a unsuitability/suitability circumstance

* Note: Ground #8 Facts continued at page 1ª

b. Supporting cases, rules, or other authority.

Ground #8 Points and Authorities at pages ~~48,49~~50.

1  GROUND #8 FACTS CONTINUED :

2  (5) The requirement of "some soul-searching" is

3      a makeweight rationalization to substantiate

4      a parole denial rationale.

5  (6) Pen. Code §5011(b)is a procedural protection.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7. ⬛⬛⬛⬛ Ground ___9___ (if applicable):

Petitioner contends he was denied his right to an "impartial" panel, as guaranteed in Schweiker -v- McClure (1982) 456 US 188, 72 L.Ed. 2d 1, 102 S. Ct. 1665, when B.P.H. panel claimed "gains are recent" and need to "maintain gains" to support parole denial.

a. Supporting facts:
(1) According to the I.P.H. Tx's (EXH. " A "), the NINTH reason for parole denial was:
   "The prisoner's gains are recent and he must demonstrate the ability to maintain gains over an extended period of time." — EXH. " A " p. 66 l 26 - p. 67 l 3

(2) The record before the B.P.H. panel establishes programs and assignments during his entire incarceration (±10 years).

(3) Petitioner entered CDC on 9/19/06 — EXH "A" p.1 l 12-13, p. 36 l 5-6
   • In 1997 & 1998, he participated in Success after Parole — EXH " A " p. 40 l 22-24.
   • Also, he participated in Anger Management around the same time — EXH "A" p. 40 l 25-26, p. 50 l 2-6.

(4) Petitioner's life term (7-to-life) began on September 14, 1999 — EXH "A" p. 1 l 13-14

* Note: Ground #9 Facts continued at pages 21, 22.

b. Supporting cases, rules, or other authority:

Ground #9 Points and Authorities at pages 51, 52.

1 GROUND #9 FACTS CONTINUED:

2 (5) At Petitioner's Initial Classification, he received

3 a total classification score of 63 points.

4 After years of positive program, where he can

5 earn points to be deducted, he now has the

6 mandatory minimum of 19 points due to CDCR's

7 new classification scoring system. Where he

8 could earn up to 8 points per year For satisfactory

9 program and no disciplinary(ies): 19 points from

10 63 points establishes his gains are not

11 recent but during entire time of incarceration.

12 (6) Upon information and belief, and therein alleged,

13 Petitioner's points were at 17 and to go lower

14 before the new system of mandatory 19 was

15 implemented (to make it easier to keep lifers

16 in level 2 without complex overrides, or other

17 offenders out of level 1).

18 (7) Attached at EXH "C" are copies of chronos

19 that give this Court further data about the

20 following; or which help support referenced data:

21 • January 1999 Complete Small Engine Repair

22    Program — EXH "A" p. 39 ℓ9-11;

23 • MAY 1999 Laudatory Chrono - EXH "A" p. 37 ℓ1-3;

24 • October 1999 Laudatory Chrono - EXH "A" p.37 ℓ4-6;

25 • July 2000 Laudatory Chrono — EXH "A" p.38 ℓ20-23

26 • 2002 Completed Clerk Training - EXH "A" p.39 ℓ11-13

27 • June 2004 General Chrono Receiving+ Release

28 • September 2004 (Positive Work Chrono) -EXH "A" p. 37 ℓ6-8

[cont.]

1  GROUND # 9 FACTS CONTINUED:

2  (P.9 cont-)

3      • August 2005 Work Chrono    — EXH "A" p.37 l8-9

4      • September 2005 Complete 12 week Program — p.37 l10-11, EXH "A"

5      • December 2005 Culinary Chrono — EXH "A" p.38 l18-20

6      • January 2006 Work Chrono    — EXH "A" p.38 l26-27,
7       p.39 l1-2

8      • Excellent Work Reports (101's) 2006

9  (8) Also, as the Board considered All Relevant,
10     Reliable Information about Petitioner, they
11     must have also reviewed the Work
12     Reports/Chronos in EXH "D".

13 (9) The evidence before the B.P.H. disproves their
14    conclusory and vague opinion that "Petitioner's
15    gains are recent." Petitioner's gains are
16    continuous.

17 (10) There is no evidence in the record which would
18     support that Petitioner wouldn't maintain his
19     gains if paroled.

20

21

22

23

24

25

26

27

28

7 ▓▓▓▓▓ Ground 10 (if applicable)

Petitioner contends that the rationale used by the Parole Board
to impose multi-year denial was in violation of the
Evitts v Lucey (1985) 105 S. Ct. 830, 838-39, 469 US 388 holding that
even discretionary actions must comply with due process; thus,
reasons used are invalid as proved violative of other U.S.S. Ct. holdings.

a Supporting facts:

(1) Notwithstanding the 9 aforementioned reasons (i.e.
Ground 1-9 #(1) of each, the Parole Board also gave
Petitioner a multi-year denial (i.e. 2 years). For
purposes of clarity Petitioner will call the multi-year
denial the 10TH reason to deny parole.

(2) According to the I.P.H. Tx's (EXH "A"), the 10TH
reason consisted of 8 sub-reasons that encompassed
every reason to deny parole.

(3) For purposes of this Ground, Petitioner has created
Chart A, for an At-a-Glance review:

| CHART A | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Denial Ground | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Multi-Year Ground | 1 | 2 | 3 | 5 | 4 | 6 | ⅞ | 7 | 8 |

(4) Specifically, the 8 sub-reasons supporting
Multi-year denial are as follows as excerpted
from EXH "A" p. 67 l 7-26 / p. 68 l 1-20 8

* NOTE: Ground #10 Facts continued at page 24.

b  Supporting cases, rules, or other authority:

Ground #10 Points and Authorities at pages 53,54.

GROUND 10 FACTS CONTINUED:

(P.4 Cont.)

[Reasons For Multi-Year Parole Denial]

p.67 l.7-26

"In a seperate decision ... The specific reasons are as follows ... [1] multiple victims from seperate instances ... [2] The motive for this crime remains inexplicable ... [3] The prisoner has programmed in a limited manner ... [4] There was one serious disciplinary ... [5] You have not sufficiently participated in self-help programs. We also note that the

p.68 l.1-20

[6] psychiatrists report dated 1/20/06 prepared by Laura Petracek is not totally supportive in that within a controlled setting he has a risk of minimal — the risk is minimal compared to that of the average inmate. If released into the community his violence risk is slightly higher compared to the average citizen. Significant risk factors and precursors to violence are his past alcohol and substance abuse ... [7] Although he has been disciplinary-free since his incarceration he still denies any responsibility for his crime. This evaluator feels that the inmate needs to do some soul-searching before he is eligible for release ... [8] Under remarks, the prisoner's gains are recent and he must demonstrate the ability to maintain those gains over an extended period of time."

[5]   Petitioner adopts and incorporates, as if fully stated herein, the Ground 1 through Ground 9 Facts inclusive of associated Points and Authorities.

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.   If yes, give the following information:

   a   Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court").

   b   Result _____   c   Date of decision. _____

   d.  Case number or citation of opinion, if known: _____

   e.  Issues raised:  (1) _____

       (2) _____

       (3) _____

   f.  Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9   Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.   If yes, give the following information:

   a   Result. _____   b.  Date of decision: _____

   c.  Case number or citation of opinion, if known: _____

   d.  Issues raised:  (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal.

    NOT APPLICABLE

    _____

11  Administrative Review:

   a   If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   The Board of Parole Hearings on/after May of 2004 has repealed its Appeals Review Unit, thus the doctrine of exhausted Administrative remedies does not apply. *Concerned Cit. of Palm Desert, Inc. -v- Riverside Cty. Bd. of S.* (Cal. App. 4TH Dist. Div. 2 1974) 113 Cal. Rptr. 338, 343: "The rule that a party must exhaust his administrative remedies before seeking judicial relief has no application where no administrative remedy existed." (*Ramos -v- County & Madera* 4 Cal. 3d 685, 691; *Diaz -v- Quitoriano* 268 Cal. App. 2d 807, 812 )

   b   Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No. SEE ₱ 11 a., supra.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13 a  (1) Name of court _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised· (a) _____

     (b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b.  (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised· (a) _____

     (b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____
_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

There is no unreasonable delay. Transcripts final July 24, 2006 and due to mandated work schedule, library closures, lockdowns, et cetera, I have sent as soon as factual/legal basis known to me on all grounds.

16 Are you presently represented by counsel?  ☐ Yes.  ☒ No  If yes, state the attorney's name and address, if known:

_____
_____

17  Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No.  If yes, explain:

_____
_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

According to In Re Roberts (2005) 36 Cal. 4th 575 (challenges to denial of parole are to be adjudicated in court that rendered judgement)

I, the undersigned, say· I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date. 12/20/2006       ▶ _____
                          (SIGNATURE OF PETITIONER)

MC 275 [Rev. January 1, 1999]       PETITION FOR WRIT OF HABEAS CORPUS       Page six of six

26

1    JESSE HERNANDEZ (K-21116)
2    GW-104-4p , CTF-SOLEDAD (CENTRAL)
     P.O. BOX 689
3    SOLEDAD , CA 93960-0689
       (IN PRO PER)
4

5

6

7

8        IN THE SAN DIEGO COUNTY SUPERIOR COURT

9      IN AND FOR THE STATE OF CALIFORNIA

10

11

12

13   IN RE JESSE HERNANDEZ ON H.C. | RE: AMENDMENT / SUPPLEMENT
14    (JESSE HERNANDEZ - PETITIONER) |    TO PETITION FOR WRIT
          -V-              |     OF HABEAS CORPUS
15   (B. CURRY , WARDEN (Resp.) | (EVIDENTIARY HEARING REQUESTED)

16                I.

17           INTRODUCTION

18   PETITIONER is before this COURT regarding the
19 Board of Parole Hearings' actions of alleged violations
20 of regulatory / statutory guidelines in violation of
21 procedural due process.
22    He challenges all of the Board's actions occuring
23 at the 3/26/2006 Parole Hearing, as delineated in
24 specified grounds.

25

26

27

28                 27

## II

### JURISDICTION

Jurisdiction is appropriate under Cal. Penal Code § 1473 et seq., and California Constitution's Article VI, Section 10.

## III

### VENUE

Venue is appropriate in the county of Commitment per the California Supreme Court's decision in In Re Roberts (2005) 36 Cal. 4TH 575.

## III

### PARTIES

I, Jesse Hernandez (Petitioner), am incarcerated in the California prison system due to criminal conviction by jury out of San Diego County. I was remanded to the care and custody of the Director of Corrections in year of '96.

B. Curry____, Warden, is the current agent / employee of the California Department of Corrections and Rehabilitation, under supervision of the Secretary of the CDCR, who has the present /actual custody and control of Petitioner in Monterey County, California at Correctional Training Facility -Soledad.

## V

### FACTS

FACTS FROM PAGE _3_ TO PAGE _23_ (GROUNDS _1_ TO _10_ ) ARE INCORPORATED AND ADOPTED BY REFERENCE.

28

## VII.
## MEMORANDUM OF POINTS AND AUTHORITIES
### 1.

Petitioner contends the holding of Superintendent ...-v- Hill (1985) 472 US 445, 105 S.Ct. 2768 was violated when parole denied by use of factor of non-applicable circumstance of unsuitability; thus, it was arbitrary and capricious to manipulate the regulatory restriction contrary to liberty interest in fundamental fairness.

In Superintendent, Mass. Corr. Inst. -v- Hill (1985) 105 S.Ct. 2768, 2774, 472 US 445:

"We hold that the requirements of due process are satisfied if some evidence supports the decision ... This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced ... [T]he relevant question is whether there is any evidence in the record that could support the conclusion ... The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions ... that have some basis in fact." [Emphasis Added].

In this particular case, the Board surmised that: "That is, first, there are multiple victims in separate incidences."

However, this Court has to remember that In Re Rosenkrantz (2002) 128 Cal. Rptr. 2d 104, 138, 29 Cal. 4th 616 cert. denied 123 S.Ct. 1808, 155 L.Ed 2d 669 held:

"Parole Applicants in this state have an expectation that they will be granted parole unless ... they are unsuitable for parole in light of the circumstances specified by statute and by regulation." [E.A.]

29

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2  (1. Cont.)

3  Harmonizing with Rosenkrantz, supra, the California

4  Supreme Court, in In Re John E. Dannenberg (2005) 34 Cal.4TH

5  1061, 23 Cal. Rptr. 3d 417:

6  "[Penal Code] Section 3041 addresses how the Board
   is to make parole decisions for indeterminate

7  life inmates ... [A] In response to these
   requirements, the Board has adopted regulations

8  covering the various categories of indeterminate

9  life inmates ... [A] The regulations do set detailed

10  standards and criteria for determining whether

11  a murderer with an indeterminate life sentence

12  is suitable for parole." [E.A.]

13  As the Board's CCR§ 2400 et seq Guidelines apply

14  to Petitioner's case also, they should adhere to the strictness

15  of their own Guidelines. Terhune - v - Sup. Ct. (Whitley) (1998)

16  65 Cal. App. 4TH 864, 872: "[A]dministrative actions exceeding

17  those powers are void."

18  In CCR § 2402 (c)(1)(A), as a factor to prove the CCR

19  §2402 (c)(1) — see infra — circumstance #1(A) provides:

20  "Multiple victims were attacked, injured or killed
   in the same or separate incidents."

21  Therefore, CCR § 2402(c)(1)(A) can only be applicable

22  as a factor when CCR § 2402(c)(1) is proved as follows:

23  "Commitment Offense. The prisoner committed the
   offense in an especially heinous, atrocious or cruel

24  manner. The factors to be considered include:"

25  In Re DeLuna (Cal. App. 6TH Dist. 2005) 24 Cal. Rptr. 3d 643,

26  649-50:

27  "We must confine our review to the stated factors
   found by the Board, and all the evidence presented

28  [cont.]

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                    (1 cont.)

3      at the parole hearing which is relevant to those

4  findings [J]" [E.A.]

5  Here, the Board did not even allege the CCR§ 2402(c)(1)

6  finding, as it couldn't. This makes finding 'arbitrary and capricious.'

7  Daniels -v- Williams (1986) 106 S.Ct. 662, 665, 474 US 332

8      " By requiring the Government to follow appropriate

9      procedures when its agents decide to " deprive

10     any person of life, liberty, or property," the Due

11     Process Clause promotes fairness in such decisions.

12     And by barring certain Government actions

13     regardless of the fairness of the procedures used

14     to implement them, ..., it serves to prevent

15     Governmental power from being "used for purposes

16     of oppression [J]"

17  Herewith, Petitioner has proved how the Board's decision

18  violated his right to procedural due process under

19  the 14TH Amendment's Due Process clause. Also, he has

20  established how due process under the Cal. Const. was

21  violated by arbitrary use of factor not applicable to

22  unalleged circumstance. Coextensively, these clauses

23  overlap in the aforementioned analysis.

24     In Hamdi -v- Rumsfeld (2004) 542 US 507, 537, 124 S.Ct.

25  2633 : "[W]e have utilized the "some evidence" standard in

26  the past as a standard of review, not a standard of proof."

27  People -v- Cluff (Cal.App. 1st. Dist. 2001) 105 Cal.Rptr2d 80, 83 :

28      "[A]ll exercises of legal discretion must be grounded in

        reasoned judgement and guided by legal principles and

        policies appropriate to the particular matter at issue." [Cites omitted]

   The Board's actions were disingenuous to the governing law.

31

VII.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                              2.

3  Petitioner contends that the use of
   "motive" to deny parole violated the
4  MORRISSEY -v- BREWER (1972) 408US
5  471,481,92S.Ct 2593 holding that
   procedural protections be followed
6  which the situation demands.

7

8   In MORRISSEY -v- BREWER (1972) 408US 471,481,92S.Ct 2593,2600,

9  33 L.Ed 2d 484, the High Court held:"[D]ue process is flexible

10 and calls for such procedural protections as the particular

11 situation demands." At the Parole Consideration Hearing

12 situation, the Board must adhere to their Regulations (see,

13 e.g. In Re Rosenkrantz, supra, In Re Dannenberg, supra).

14  Simply put, the Board is not permitted to put the cart

15 before the horse.

16  Here, the Board denied parole by stating (as related to motive):

17    "The motive of this crime remains inexplicable in

18    that we still don't have a clear understanding

      of why these crimes occurred, except for Mr.

19    Hernandez's desire to control Ms. Wolf."

20  Therefore, it is unequivocally implied that the Board was

21 attempting to use CCR§2402(c)(1),(E) which states:

22    "Commitment Offense. The prisoner committed the offense

      in an especially heinous, atrocious or cruel manner.

23    The factors to be considered include: * * * [A] (E)

      The motive for the crime is inexplicable or very

24

25    trivial in relation to the offense."

26  Minimally, the Board has punished Petitioner for invoking

27 his right under Penal Code §5011(b), which states:

28

                              32

## VI.

### MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(2. cont.)

"The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Parallels Amend.5 "witness against self" clause.

Notwithstanding the absolute right under Pen.Code §5011, In Re George Scott (Cal.App.1st.Dist.2004) 119 Cal.App.4th 871, 15 Cal.Rptr.3d 32:

"An "inexplicable" motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernable purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous."

In arguendo, without admitting the accuracy or truth, the Board itself concluded the motive was for "Mr. Hernandez's desire to control Ms. Wolf." The Board's conclusion as to motive is arbitrary and capricious as what they stated is opposite their own guidelines.

CCR § 2236 states:
"The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner[.][E.A.]"

The evidence before this court shows the Board did use

33.

## II.
### MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
#### (2 cont.)

Petitioner's silence against him when they stated "we still do not have a clear understanding of why these crimes occured [.]"

Further, in Irons -v- Warden of C.S.P. - Solano (E.D. Cal. 2005 ) 358 F.Supp. 2d 936, 942 :

> "The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial [CCR §2402 (c)(1)(E)] ··· Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility. [E.A.]

Heretofore, motive has yet to establish Petitioner's commitment offense as "especially heinous, atrocious or cruel."

In Groppi -v- Leslie (1972) 404 US 496, 30 L.Ed 2d 632, 636, 92 S.Ct. 582 : "This Court has often recognized that the requirements of due process cannot be ascertained through mechanical application of a formula. See, e.g., Cafeteria Workers -v- McElroy, 367 US 886, 894-895, 6 L.Ed. 2d. 1230, 1235, 1236, 81 S.Ct. 1743 (1961) [.]" In Cafeteria Workers -v- McElroy (1961) 367 US 886, 6 L.Ed 2d 1230, 1236, 81 S.Ct 1743 :

> "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." "It is "compounded of history, reason, and the past course of decisions ···."

Here, the Board's use of "motive" violated the 14th Amend. Due Process clause when violating procedural protections; under State law also.

34

III.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

3.

2
3  Petitioner contends that the Board's
conclusion about limited program
4  is a denial of the "Fundamental
Fairness" doctrine as upheld in
5  Walters -v- Nat. Assn. of Radiation
6  Survivors (1985) 473 US 305, 105 S.Ct.
7  3180, 3189.

8  In Walters -v- Nat. Assn. of Radiation Survivors (1985)

9  473 US 305, 87 L.Ed2d 220, 105 S.Ct. 3180, 3189:

10  "The very nature of the due process inquiry indicates
that the fundamental fairness of a particular
11  procedure does not turn on the result obtained
in any individual case; rather, "procedural due
12  process rules are shaped by the risk of error
13  inherent in the truth-finding process as
14  applied to the generality of cases, not the rare
15  exceptions."

16  The extensive record before this Board is that Petitioner
17  has programmed as assigned and as available.

18  Galland -v- City of Clovis (Cal 2001) 103 Cal.Rptr 2d 711, 24 Cal.
19  4TH 1003: "[W]hen the process itself is fundamentally
20  unfair, even agency determinations supported by substantial
21  evidence may be overturned; it is the very unfairness
22  of the hearing that undermines the reliability of the
23  administrative record being reviewed."

24  . Haas -v- County of San Bernardino (Cal.2002) 119 Cal.Rptr 2d
25  341, 346, 356:

26  "To summarize the governing principles, due
27  process requires fair adjudicators in courts   [cont.]

28

35

1    <u>VI.</u>
     <u>MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED</u>

2    (3 cont.)

3    and administrative tribunals alike ...[p.356]

4    However, [t]he unfairness that results from
     biased decisionmakers strikes so deeply at

5    our sense of justice, that it differs qualitatively
     from the injury that results from insufficient

6    procedures."

7    As an unsuitability factor, <u>CCR§2402(c)(6)</u> states:

8    "Institutional Behavior. The prisoner has engaged in

9    serious misconduct in prison or jail." On the other side

10   of this equation, <u>CCR§2402(d)(9)</u> as a suitability

11   factor, states: "Institutional Behavior. Institutional

12   activities indicate an enhanced ability to function

13   within the law upon release." During Petitioner's

14   entire term-to-life incarceration he has shown ability

15   to function within the law.

16   Here, the Board's statement of "The prisoner has,

17   in terms of institutional behavior, programmed in a

18   limited manner while incarcerated" is rote & ritualistic.

19   Here, the Board Panel was not impartial, and Petitioner

20   has shown how the Board Panel prejudged limited program

21   question by proving he has no disciplinaries for

22   limited program. The record belies limited program.

23   <u>Stivers -v- Pierce</u> (9th Cir.1995) 71 F.3d 732, 748: "We

24   therefore hold that where one member of a tribunal

25   is actually biased, the proceedings violate due process."

26   Petitioner has therefore proved how the B.P.H. panel

27   violated "Fundamental Fairness" under 14th Amend. <u>Due Process</u>

28   clause.

                              36

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES    CONTINUED

2                    4.

3  Petitioner contends that the B.P.H.'s
   unsuitability rationale that the
4  record shows" you have not participated
   in beneficial self-help programs"
5  [Emphasis Added] is an abuse of
6  power by being arbitrary as held
7  in County of Sacramento -v-lewis
8  (1998) 118 S.Ct. 1708, 1716, 523 US 833.

9  In order to deny parole, the B.P.H. panel and their
10 concurring review unit declared: "That you have not
11 participated in beneficial self-help programs." [E.A.]
12  As the "have not" decision is fact specific with an
13 absolute conclusion: Petitioner need only prove the
14 opposite that he has participated in beneficial self-
15 help programs. If Petitioner establishes by clear
16 and convincing evidence that the Board's conclusion
17 is false; minimally it is arbitrary.
18   In County of Sacramento -v-lewis (1998) 118 S.Ct.
19 1708, 1716, 523 US 833 has held:
20      "We have emphasized time and again that "[t]he
        touchstone of due process is protection of the
21      individual against arbitrary action of
22      Government,"--- Thus, in Collins -v- Harker
        Heights, for example, we said that the Due
23      Process Clause was intended to prevent
24      Government officials "" "From abusing [their]
25      power or employing it as an instrument
        of oppression."'"
26
27  In this case; the plain facts disprove the B.P.H. Panel-
28

                    37

VI.

1 | MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2 | (4 Cont.)

3 | The B.P.H. has entitled CCR§2000 "Rules of Construction

4 | and Definitions". Nowhere in these definitions does the

5 | Board define beneficial self-help. In CCR§2410(b), the

6 | regulation talks about credits when participating in

7 | assignments and self-help. However, adding some

8 | illumination is <u>CCR§2410(c)(2)</u> which states in part:

9 | "Participation in Self-Help and Rehabilitative
   Programs. All life prisoners are presumed to

10 | participate in programs for self-development

11 | (refer to CDC Rules 3040 and 3041). [Bold & Emphasis

12 | Added]

13 | Therefore, by cross-reference, the important analysis

14 | of <u>CCR§3040</u> is as follows:

15 | ¶(a) "Every able-bodied person ... is obligated to
        work <u>as assigned</u> ...." [E.A.]

16 |

17 | ¶(b) "Inmates <u>assigned</u> ...." [E.A.]

    | ¶(c) "[C]ommittee shall <u>assign</u> ...." [E.A.]

18 | ¶(d) "Despite an inmate's <u>assignment</u> ...." [E.A.]

19 | ¶(e) "Inmates <u>assigned</u> ...." [E.A.]

20 | ¶(g) "Work <u>assignments</u> ...." [E.A.]

21 | Notwithstanding CCR§3040; <u>CCR§3041</u> provides for

22 | relevant analysis:

    | ¶(a) "Inmates must perform <u>assigned</u> tasks ...." [E.A.]

23 | ¶(c) "Inmates must perform their work and program

24 | <u>assignments</u> ...." [E.A.]

    | ¶(d) "Inmates <u>assigned</u> ...." [E.A.]

25 | ¶(e) "Inmates in <u>assignments</u> ...." [E.A.]

26 | Contrary to the Board's analysis about "<u>not</u>" having

27 | participated in self-help: the record disproves them.

28 |
                              38.

VI.

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(4 Cont.)

Having disproved the Board's rote conclusion, Petitioner has established how the B.P.H. panel acted in an arbitrary manner by abusing their discretion.

Where In Re Rosenkrantz, supra, and In Re Dannenberg, supra mandate the Board obey their regulations in order to comply with due process: Petitioner has substantiated how the B.P.H. violated procedural due process protections guaranteed by the 14TH Amendment of the U.S. Constitution.

F.P.C. -v- Transcontinental Gas Pipe Line (1976) 96 S.Ct. 579, 582: "IF the decision of the agency "is not sustainable on the administrative record made, then the ... decision must be vacated and the matter remanded ... For further consideration." Id.; at 143, 93 S.Ct. at 1244."

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                          5.

3          Petitioner contends that the use of
4      a +8 year old prison disciplinary is
5      beyond the scope of the B.P.H.'s
       authority, of this disciplinary as a
6      parole unsuitability factor, in light
7      of Greenholtz -v- Inmates of Neb. Penal
       and Corr. Complex (1979) 442 US 1, 15, 99 S.Ct.
8      2100 and restoration of credits lost by
9      another agency.

10        In Greenholtz -v- Inmates of Neb. Penal & Corr. Complex
11   (1979) 442 US 1, 15, 60 L.Ed. 2d 668, 99 S.Ct. 2100: "[T]he behavior
12   record of an inmate during confinement is critical in
13   the sense that it reflects the degree to which the
14   inmate is prepared to adjust to parole release."
15      The one prison disciplinary was used to deny parole as
16   follows: "There was one serious disciplinary action, a 115,
17   in February of 1998 for Mutual Combat." This disciplinary
18   occurred during Petitioners determinate term where punishment
19   was imposed, and credit forfeited and re-instated before the
20   term-to-life sentence started.
21    . Minimally, under double jeopardy administrative
22   collateral estoppel doctrine : the Cal. Executive Branch of
23   Government should not be able to punish Petitioner twice
24   for one action.
25    . This Court should also Keep in mind that the
26   CCR§2402 (c)(6) "Institutional Behavior. The prisoner
27   has engaged in serious misconduct in prison or jail"

28                        40

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
(5 Cont.)

cannot be read in isolation or contrary to statute.
Further, CCR §2402(d)(9), for suitability reads:
"Institutional Behavior. Institutional activities
indicate an enhanced ability to function within the
law upon release. All of this language was
filed 9-8-81 and effective 30 days later (History under
CCR §2400 et seq). This Court should be aware that this
CCR §§ 2402(c)(6)/2402(d)(9) language is verbatim
of CCR §§ 2281(c)(6)/2281(d)(9) respectively, as filed
7-31-78.

California Penal Code §2932(d) states in part, as
operative 7-1-77: "IF found guilty the prisoner
shall be advised in writing of the guilty finding
... and the amount of time-credit loss." [E.A.]
Notwithstanding Pen. Code §2932(d), supra, Pen. Code §2932
(e) states in part: "The prisoner shall be notified of ...
the restoration of any credits previously forfeited." [E.A]
Thus, nothing in Penal Code §2932 gives the B.P.H. the
ability to use restored credits after CDC restored
them under CCR §§ 3327 and 3328.

Also, in 64 Ops. Cal. Atty. Gen. 776 (1981 WL 126813)
as dated 10/9/81 by then Attorney General George
Deukmejian: "For a parole release date not to be set
at either an initial or subsequent parole hearing
on the basis of pending criminal or serious

41

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(5 Cont.)

disciplinary charges, the emphasized phrase [i.e. gravity of current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses] must be construed as referring to pending charges, not to offenses for which the prisoner has been convicted." NOTE: This opinion was 1 day after CCR § 2402 was in effect. Therefore, the B.P.H. is bound by the Attorney General's interpretation having effect of law. Dannenberg / Rosenkrantz, supra, mandate procedure.

As the Board is fully aware of the California Administrative Procedures Act (A.P.A.), as they adopt, amend, rescind regulations; they know that Gov't Code §§ 11340.5(a) and 11342.600 forbid them from going beyond scope of regulation.

In Martin -v- Marshall (N.D. Cal. 2006) 5/17/06 ___ F.Supp.2d ___ (2006 WL 1344584 (N.D. Cal.)): "with respect to petitioner's disciplinary violations [numerous 8 years before hearing] there is significant evidence in the record of petitioner's positive institutional behavior, which reasonably mitigates the effect that petitioner's past violations have on his suitability for parole."

Therefore, Petitioner's procedural due process rights have been violated by the Board's use of disciplinary to deny his 14TH Amend. "liberty" interest in parole. He was not given process due as Morrissey -v- Brewer, passim, mandates

42

## VI.
1 MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                   6.

3      Petitioner contends that the B.P.H.'s

4 use of Psych Report that was known to

5 be inaccurate (affecting risk assessment),

6 as a parole unsuitability circumstance,

7 and which was modified to a lower assessment prior to finality of the

8 Decision, violated Due Process guarantee to fair decision as held in Arkansas

9 -v- Oklahoma (1992) 112 S.Ct 1046, 503 US 592.

10 Arkansas -v- Oklahoma (1992) 112 S.Ct. 1046, 1060, 503

11 US 592 holds: "As we have often said an agency ruling

12 is 'arbitrary and capricious' if the agency 'has ... entirely

13 failed to consider an important aspect of the problem.'"

14     Under this point, the Board stated: "The psychiatrist's

15 report ... is not totally supportive -- his violence risk

16 is slightly higher compared to the average citizen."

17     Before Petitioner elaborates on how the Psych Report is

18 in violation of Due Process, he points out to this Court that

19 CCR§2402(c)(5), as a "Circumstance Tending to Show

20 Unsuitability", states: "Psychological Factors. The prisoner

21 has a lengthy history of severe mental problems related

22 to the offense." The record is entirely devoid of any

23 evidence to support CCR§2402(c)(5).

24     In light of Rosenkrantz/Dannenberg, supra, the

25 Board must adhere to their regulations.

26 CCR§2402(b) mandates: "All relevant, reliable

27 information available to the panel shall be considered(.)

28                  43

## VI.
### MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
### (6 Cont.)

1  
2  In this instant case, the B.P.H. panel was
3  explicitly advised by Petitioner's lawyer that the
4  Psych Report was inaccurate. However, the Board
5  chose to use it anyway instead of granting a new
6  hearing after new Psych Report during review
7  period : before hearing was final.
8      Here, where the Board refused to have a new
9  report for the Initial Parole Hearing, as mandated by
10  law, they "entirely failed to consider an important
11  aspect of the problem" as held in Arkansas -v-
12  Oklahoma, supra.
13      The Psych Report does not have to be "totally supportive".
14  It oust has to establish that /support" the prisoner
15  will pose an unreasonable risk of danger to society
16  if released from prison "— CCR §2402 (a). Here, the Psych
17  Report didn't support the B.P.H.'s conclusion.
18  Irons -v- Warden of C.S.P.-Solano (E.D.Cal. 2005) 358
19  F-Supp-2d 936, 942 : "[A] conclusion by lay B.P.T.
20  Commissioners, that petitioner has yet achieved required
21  therapy for insight or other reasons is not reasonably
22  sustainable [.]"
23      Based on the aforementioned, in light of a even
24  more favorable risk assessment, Petitioner's 14TH
25  Amendment liberty interest in parole has been
26  deprived by procedural due process being violated
27  when using Psych Report to support parole denial.
28

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                              7.

3      Petitioner contends that the B.P.H.'s
4  use of his prior alcohol and
5  substance abuse is a violation of
   Due Process, due to the failure to
6  follow its own procedures (Judicially
   determined) and therefore in
7  violation of United States -v-
8  Cacerres ( ) 59 L-Ed 2d 733, 743 fn-14,
   440 US 741, 99 S.Ct 1465.

9

10  <u>United States -v- Cacerres</u> ( ) 59 L-Ed 2d. 733, 743 fn.14
11  in part, 440 US 741, 99 S.Ct. 1465 has held:

12      "Where the rights of individuals are affected, it
13      is incumbent upon agencies to follow their
        own procedures. This is so even where internal
14      procedures are possibly more rigorous than otherwise
15      would be required. (Morton -v- Ruiz 415 US 199, 235,
        39 L-Ed 2d. 270, 94 S.Ct. 1055)."
16

17      In this particular claim, Petitioner has been denied
18  his 14th Amendment "liberty" interest in parole, in violation
19  of procedural due process, when the B.P.H. panel claimed:
20      "And significant risk factors and precursors
21      to violence are his past alcohol and substance
        abuse and a relapse would increase his
22      risk of violence or undo gains he has made."

23      This was part of the Psych Report assessment specifically
24  excepted to use to deny parole. This and any future Court
25  should keep in mind the Commissioner stating: "I will tell
26  you that even absent the psychologist report that our
27  finding would be the same." So, above rationale is refutable.

28                            45

## VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2            (7 Cont.)

3      Clearly the Board has to obey their procedures

4  (see In Re Rosenkrantz & In Re Dannenberg, supra). Thus,

5  it must be the correct procedures as interpreted by

6  the Courts.

7      In Re Earnest Smith (Cal. App. 6th Dist. 2003) 114 Cal. App. 4th 343,

8  371, ___ Cal Rptr 3d ____ :

9      "Smith's past desire for use of drugs does not by
       itself reasonably establish current unsuitability,

10     because there is no additional evidence to complete
       a chain of reasoning between his past drug use and

11     ... an unreasonable risk of danger if released."

12     Likewise, there is also no additional evidence in

13  Petitioner's case.

14     In Re (Mark) Smith (2003) 109 Cal. App. 4th 489, 505, 134 Cal.

15  Rptr. 2d 781, 792 :

16     "[T]here is no evidence in the record to show that
       Smith is presently addicted to drugs --- While

17     there is evidence that he used drugs and abused

18     alcohol at the time of the murder, a prisoner's
       prior addiction is not an appropriate consideration in

19     determining parole suitability."

20     So, if not appropriate, the Board shouldn't have used

21  prior alcohol and substance abuse to deny parole.

22     Thompson - v - Davis (CA9 Cal. 2002) 295 F.3d 890, 898 (The

23  Board may not deny parole based on a petitioners history

24  of substance abuse.) Minimally California must obey

25  9th Circuit Precedent (see N.L.R.B. - v - Askenazy Property

26  Management Corp. (CA9 1980) 817 F.2d 74, and Spraic - v - U.S.R.R.

27  Retirement Bd. (CA9 1984) 735 F.2d 1708).

28

1   MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2   (¶ Cont.)

3   Therefore, both the California and Federal Judicial

4   systems have plainly and clearly stated prior addiction/

5   use of substances is not a parole unsuitability

6   circumstance.

7   Plainly, as substantiated by Petitioner, the B.P.H. has

8   refused to adhere to: Walsh-v-Kirby (1974) 118 Cal.Rptr.

9   1, 8, 13 Cal.3d 95, 529 P.2d 33 holding of: "However,

10  discretion cannot be exercised so as to "enlarge its

11  own boundaries or support acts requiring other

12  legal bases.", and Newman-v-Apfel (9TH Cir.2000) 223 F.3d

13  937, 943: "The fact that an agency has broad discretion

14  in choosing whether to act does not establish that the

15  agency may justify its choice on specious grounds."

16  Whether independent and/or cumulative the B.P.H./

17  Psych decision to deny parole based on usage of

18  substances is illusory to the point of being camouflage

19  of a makeweight rationalization to deny parole.

20  The arbitrariness of this rationale is fully exposed

21  when the trial record and Probation Report are devoid

22  of any evidence of alcohol or controlled substance(s)

23  being causitive factor for any offense which Petitioner

24  stands convicted; although maintaining his innocence.

25

26

27

28

47

VI.

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

8.

Petitioner contends that the B.P.H.'s conclusion that "he still denies any responsibility for his crime" is a predisposition reflecting inability to render fair judgement (due to needed "soul-searching") as held violative of Due Process in Liteky -v- U.S. (1994) 114 S.Ct. 1147, 1155, 510 US 548 as it equates to "bias" or "prejudice".

The B.P.H. panel substantiated the denial of parole, in part, when stating:

"Although he has been disciplinary-free since his incarceration, he still denies any responsibility for his crime and this evaluator feels that the inmate needs to do some soul-searching before being considered for release." [E.A.]

First, "some soul-searching" is a non-quantifiable equation without any parameters. It is not a criteria for suitability/unsuitability. As "soul-searching" may connote religious forgiveness: this requirement would violate the "establishment of religion" clause of the 1st Amendment (see Turner -v- Hickman (E.D. Cal 2004) 342 F.Supp. 2d 887) and the "coercion test" forbidden in Lee -v- Weisman (1992) 505 US 577, 587, 112 S.Ct. 2649, 120 L.Ed 2d 1467.) Gillette -v- United States (1971) 91 S.Ct. 828, 836: "[T]he central purpose of the Establishment Clause [is] the purpose of ensuring governmental neutrality in matters of religion."

48

VI.

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(8 Cont.)

Regarding the aspect of "denies any responsibility", the B.P.H. intentionally disregarded Cal. Penal Code §5011 (b)'s mandate of:

> "The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."

In O'Bremski -v- Maass (9TH Cir. 1990) 915 F.2d 418, 422:

> "Because parole board officials perform tasks that are functionally comparable to those performed by the judiciary, they owe the same duty: "to render impartial decisions in cases or controversies that excite strong feelings because of the litigant's liberty is at stake." [Cites omitted] ... Thus, O'Bremski is correct in his contention that he was entitled to have a release date considered by a parole board that was free from bias or prejudice."
> [E.A.]

Petitioner has these same protections as O'Bremski. Wherein Petitioner has established that the B.P.H. panel was predisposed to violate the law, he has established that his 14TH Amendment "liberty" interest in parole was violated by denying procedural due process.

Liteky -v- U.S. (1994) 114 S.Ct. 1147, 1155, 510 US 540:

> "A favorable or unfavorable predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" ... [When] it is so extreme as to display inability to render fair judgement."

49

1 MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2 (B Cont.)

3 Petitioner has shown to the contrary how the B.P.H.

4 panel did not judge the particular controversy (responsibility/

5 soul-searching) on valid circumstances. Witherow -v- Larkin

6 (1975) 421 US 35, 95 S.Ct. 1456, 43 L.Ed 2d 712, 728:

7 "Without a showing to the contrary, state
administrators "are assumed to be men of

8 conscience and intellectual discipline,

9 capable of judging a particular controversy
fairly on the basis of its own circumstances."

10 United States -v- Morgan, 313 US 409, 421, 85 L.Ed.

11 1429, 61 S.Ct. 999 (1941)."

12 By refusing to adhere to the statutory and case law:

13 the B.P.H. evinced their intent, when abrogating and

14 obfuscating the law, to rule in an unconstitutional

15 manner.

16 Notwithstanding the aforementioned, "soul-searching" is also

17 covered by Pen. Code §5011(b): as it is tentamount to admitting

18 guilt.

19

20

21

22

23

24

25

26

27

28

## VII.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                          9.

3      Petitioner contends he was denied his
4  right to an "impartial" panel, as
5  guaranteed in Schweiker v. McClure
6  (1982) 456 US 188, 72 L.Ed 2d 1, 102 S.Ct.
7  1665, when B.P.H. panel claimed "gains
   are recent" and need to "maintain
   gains" to support parole denial.

8      In the Calif. Code of Regulations, §2250 "A prisoner is
9  entitled to a hearing by an impartial panel."

10     Schweiker v. McClure (1982) 456 US 188, 72 L.Ed 2d 1, 102 S.Ct.
11 1665 has also held:

12     "As this Court repeatedly has recognized, due
13     process demands impartiality on the part of
       those who function in judicial or quasi-
14     judicial capacity. E.g. Marshall v. Jerrico, Inc.
15     446 US 238, 242-243 and n.2, 64 L.Ed 2d 182, 100
       S.Ct. 1610 (1980)."

16     Its unequivocal that B.P.H. panels act in quasi-judicial capacity.
17     First, Petitioner is a 7-to-life prisoner, and not a
18 15-to-life or 25-to-life prisoner. Therefore, his program to
19 be suitable for parole occurs sooner not later.

20     Here, the Board Panel was not "impartial", when stating
21 that: "The prisoner's gains are recent and he must demonstrate
22 the ability to maintain gains over an extended period of
23 time." [E.A.] The record before the Board disproves "recent"
24 as petitioner has maintained gains his entire incarceration
25 of ±10 years.

26     Sinaloa Lake Owners Ass'n v. City of Simi Valley (9th Cir. 1989)
27 882 F.2d 1398, 1409, cert. denied Doody v. Sinaloa Lake Owners Ass'n,

28                          51

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(9 Cont.)

Inc., 494 US 1016, 110 S.Ct. 1317, 108 L.Ed 2d. 493 (1990):

"[M]alicious, irrational and plainly arbitrary actions are not within the legitimate purview of the state's powers."

Tyson -v- City of Sunnyvale (N.D. Cal. 1986) 920 F.Supp. 1054, 1063:

"[S]ubstantive due process prevents ... "action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.""

In Stivers -v- Pierce (9th Cir. 1995) 71 F.3d 732, 741:

"There are two ways in which a plaintiff may establish that he has been denied his constitutional right to a fair hearing before an impartial tribunal. In some cases, the proceedings and surrounding circumstances may demonstrate actual bias on the part of the adjudicator.

Expanding on how to prove a member was impartial (biased), Stivers, supra, at p.744:

"A party alleging unconstitutional bias may prove this claim by introducing extrajudicial statements by the adjudicator that are inconsistent with the role of an impartial decision maker."

Even "predisposition" can be "bias" (Liteky -v- U.S., supra, at p.1155).

Here, based on the fictitious and absurd conclusion by the B.P.H. panel, the panel was not impartial when decision was infected with bias that was opposite to truth, facts and legal duties. Thus, Petitioner's right to "Due Process" was violated by denying "liberty" interest in parole that was not impartial.

52

## II.

## MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

10.

Petitioner contends that the rationale used by the Parole Board to impose multi-year denial was in violation of the Evitts -v- Lucey (1985) 105 S.Ct. 830, 838-39, 469 US 388 holding that even discretionary actions must comply with due process; thus, reasons used are invalid as proved violative of other U.S.S. Ct. holdings.

Petitioner adopts and incorporates the facts and points and authorities of Grounds 1-9 as these Grounds were all the same to impose the multi-year denial.

Based on each of the preceding 9 Grounds, he established how the B.P.H. violated procedural due process protections.

Evitts -v- Lucey (1985) 105 S.Ct. 830, 838-39, 469 US 388 has continued to hold:

"[A] State has great discretion in setting policies governing parole decisions, but it must nonetheless make those decisions in accord with Due Process Clause. [Cites omitted] In short, when a state opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with dictates of the Constitution — and in particular, in accord with the Due Process Clause."

In Re Edward Ramirez (Cal. App. 1st Dist. 2001) 114 Cal. Rptr. 2d 381, as left unchanged by Dannenberg reversal on other question:

"The United States Supreme Court has made it clear that the 'some evidence' standard discussed in Hill is only one aspect of judicial review for compliance with minimum standards of due process. In Edwards [cont-]

53

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(10 Cont.)

—v— Balisok (1997) 520 US 641... The court held that the scope of judicial review ... is not so cramped --- The court explained that the "same evidence" standard applies only to questions of evidentiary sufficiency. It is an additional requirement of due process, not a substitute for other due process requirements."

Two years later, Biggs —v— Terhune (CA9 Cal. 2003) 334 F.3d 910, 2003 DJDAR 8863, 8874:

"[T]he Parole Board must be cognizant not only of the facts required by state statute to be considered, but also concepts embodied in the Constitution requiring due process of law." [E.A.]

Here, the B.P.H.'s chronology of reasons to support the multi-year parole denial was a ritualistic recipe of ingredients to bolster their decision. Worth repeating is the holding of Groppi —v— Leslie (1972) 30 L.Ed 2d 632, 636, 92 S.Ct 582, 404 US 496, wherein:

"This Court has often recognized that the requirements of due process cannot be ascertained through mechanical application of a formula."

Therefore, the imposed multi-year parole denial was illegally and unconstitutionally imposed when each reason used is violative of a U.S. Supreme Court holding Howlett By and Through Howlett —v— Rose (1990) 110 S.Ct-2430, 2438, 496 US 356: "The laws of the United States are laws in the several states, and just as much binding on the... courts thereof as the State laws are."

54

## VII.
## CONCLUSION

Petitioner has established a prima facie case for relief, in light of having proven that:

A) Multiple victim rationale violated procedural due process as stated in Ground 1;

B) Motive rationale was used in a manner that violated procedural due process;

C) Petitioner's institutional behavior was not an unsuitability Factor, as limited manner, in violation of procedural due process;

D) The conclusory allegation about not having participated in self-help is disproved rendering conclusion based on violation of due process;

E) His one serious disciplinary should not have been used to deny parole as it violated procedural due process;

F) Refusal to consider proper psych report violated procedural due process;

G) Petitioner's prior alcohol use/substance abuse is not/was not unsuitability criteria as use violated procedural due process;

H) The requirement of forced admission to crime and required soul-searching violated procedural due process;

I) He has established how the Board wasn't impartial when declaring recent gains as record established contrary making decision violative of procedural due process; and

J) Multi-year denial violated procedural due process.

Therefore, based on the aforementioned, Petitioner's 14TH Amendment liberty interest in parole was denied by the arbitrary and capricious actions of the Board of Parole Hearings' panel and Review Unit, when violative of the U.S. Constitution and contrary to law.

## VIII.
### PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays this Court to enter the following relief:

1) Issue the Writ of Habeas Corpus; or

2) Alternatively issue Order to Show Cause; and

3) Appoint Counsel; and

4) Order an Evidentiary Hearing and enter the attached exhibits into evidence; and

5) Vacate the B.P.H.'s entire decision and remand for a new hearing; and

6) Declare Petitioner's Due Process rights as violated; and

7) Order that the B.P.H. cannot use any of the grounds used unless evidence complies with Due Process;

8) Take Judicial Notice of Amended Psych Report at EXH "F";

9) Grant any other relief deemed fair and in the interest of Justice including but not limited injunctive relief.

Respectfully submitted,

12 / 20 / 2006

JESSE HERNANDEZ

56

# EXHIBIT "A"

SUMMARY: 2006 Parole Hearing Transcript

EXH "A" — COVER

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

| | |
|---|---|
| In the matter of the Life ) | |
| Term Parole Consideration ) | CDC Number K-21116 |
| Hearing of: ) | |
| ) | |
| JESSE HERNANDEZ ) | INMATE |
| ) | COPY |
| _____) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 26, 2006

PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

JESSE HERNANDEZ, Inmate
CHESTER PHILLIPS, Attorney for Inmate
SUSAN GUST, Deputy District Attorney (via
                              videoconference)
TWO CORRECTIONAL OFFICERS, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | | |
|---|---|---|
| _____ | No | See Review of Hearing |
| _____ | Yes | Transcript Memorandum |

Ramona Cota                    Peters Shorthand Reporting

ii

## INDEX

PAGE

Proceedings.............................................. 1

Case Factors............................................ 15

Pre-Commitment Factors............................ 24

Post-Commitment Factors........................... 36

Parole Plans........................................... 27

Closing Statements................................... 55

Recess.................................................. 64

Decision................................................ 65

Adjournment........................................... 73

Transcriber Certification........................... 74

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER SMITH:**  You are on

3     the record.

4          **PRESIDING COMMISSIONER DAVIS:**  Good

5     morning, Mr. Hernandez.

6          **INMATE HERNANDEZ:**  Good morning.

7          **PRESIDING COMMISSIONER DAVIS:**

8     Mr. Hernandez, this is an Initial Parole

9     Consideration Hearing for Jesse Hernandez, CDC

10    number K-21116.  Today's date is March 26, 2006,

11    we are located at the Correctional Training

12    Facility.  The inmate was received on 9/19/96

13    from San Diego County with a life term beginning

14    on 9/14/1999 with a minimum eligible parole date

15    of 9/14/2006.  The controlling offense for which

16    the inmate was received is attempted murder

17    first degree, case number SCE167745.  Additional

18    counts are a total of 22 PC use of a weapon,

19    same county same case number, possession of a

20    destructive device, 120303.2 PC, same county

21    same case number count two.  Attempt to burn,

22    455 PC, same county same case number count

23    three, and stalking, 646.9(a), same county same

24    case number, count six.  This hearing is being

25    tape-recorded and for the purposes of voice

26    identification we will each state our first and

27    last name, spelling your last name.  When it

2

1  comes to you, Mr. Hernandez, if you will also
2  give us your CDC number please sir.  And I will
3  start and move to my left, James Davis, D-A-V-I-
4  S, Commissioner.
5        DEPUTY COMMISSIONER SMITH:  My name is
6  Dennis Smith, S-M-I-T-H, I am a Deputy
7  Commissioner.
8        DEPUTY DISTRICT ATTORNEY GUST:  Susan
9  Gust, Deputy District Attorney, G-U-S-T.
10        ATTORNEY PHILLIPS:  Chester Phillips, I'm
11  defense attorney for Mr. Hernandez.  My last
12  name is spelled P-H-I-L-L-I-P-S.
13        INMATE HERNANDEZ:  Jesse Hernandez.  The
14  last name is H-E-R-N-A-N-D-E-Z.  My CDC number
15  is kilo 21116.
16        PRESIDING COMMISSIONER DAVIS:  And for
17  the record we also have two correctional
18  officers who are in the room with us today who
19  will not be participating in this hearing but
20  are here for security purposes only.  Before we
21  begin, Mr. Hernandez, you have in front of you,
22  in that laminated piece of paper should be the
23  Americans With Disabilities Act.
24        INMATE HERNANDEZ:  I do.
25        PRESIDING COMMISSIONER DAVIS:  If you
26  would read that aloud for me please sir.
27        INMATE HERNANDEZ:

3

1        "The Americans with Disabilities

2        Act, ADA, is a law to help people

3        with disabilities.  Disabilities

4        are problems that make it harder

5        for some people to see, hear,

6        breathe, talk, walk, learn, think,

7        work or take care of themselves

8        than it is for others.  Nobody can

9        be kept out of public places or

10       activities because of a

11       disability.  If you have a

12       disability you have the right to

13       ask for help to get ready for the

14       BPT Hearing, get to the hearing,

15       talk, read forms and papers and

16       understand the hearing process.

17       BPT will look at what you ask for

18       to make sure that you have a

19       disability that is covered by the

20       ADA and that you have asked for

21       the right kind of help.  If you do

22       not get help or if you don't think

23       you got the kind of help you need,

24       ask for a BPT 1074 Grievance Form.

25       You can also get help to fill it

26       out."

27       PRESIDING COMMISSIONER DAVIS:  Very good.

4

1   Mr. Hernandez, our records indicate that on the

2   1st of December in '05 you signed a Form 1073

3   from the Board of Parole Hearings indicating

4   that you do not need any assistance to

5   participate in this hearing, is that correct,

6   sir?

7          INMATE HERNANDEZ:  Could you repeat the

8   question again?  I'm sorry, I didn't hear that.

9          PRESIDING COMMISSIONER DAVIS:  On the 1st

10  of December in '05 you signed a form indicating

11  that you reviewed or one of your counselors

12  reviewed with you the Americans With

13  Disabilities Act and you indicated at that time

14  that you didn't have any disabilities that you

15  need assistance with.

16         INMATE HERNANDEZ:  I did so, I indicated

17  that.

18         PRESIDING COMMISSIONER DAVIS:  I see

19  you're wearing glasses today, sir.  Are they the

20  correct prescription for you and you're able to

21  read all your documents adequately?

22         INMATE HERNANDEZ:  Yes I am.

23         PRESIDING COMMISSIONER DAVIS:  All right.

24  I see also that you are participating in the

25  CCCMS.  What does that consist of, sir?

26         INMATE HERNANDEZ:  That consists of a

27  Benadryl, which was prescribed for me with the

5

1   recent passing of my mother to reinstate some

2   consistency with my sleep patterns.

3        PRESIDING COMMISSIONER DAVIS:  All right.

4   So you're taking that drug now?

5        INMATE HERNANDEZ:  I am taking that

6   prescription now.  Actually I haven't had any in

7   over a month now.

8        PRESIDING COMMISSIONER DAVIS:  Okay, you

9   anticipated my next question then.. So you

10  haven't had any in a month?

11       INMATE HERNANDEZ:  No.

12       PRESIDING COMMISSIONER DAVIS:  So you're

13  bright and alert today without any problems.

14       INMATE HERNANDEZ:  I am.

15       PRESIDING COMMISSIONER DAVIS:  All right.

16  You walked here under your own power?

17       INMATE HERNANDEZ:  Yes I did.

18       PRESIDING COMMISSIONER DAVIS:  And you

19  don't have any -- You're able to hear me all

20  right?

21       INMATE HERNANDEZ:  Yes I am, sir.

22       PRESIDING COMMISSIONER DAVIS:  Any

23  problems that you can think of whatsoever that

24  would interfere with you actively participating

25  in this hearing today?

26       INMATE HERNANDEZ:  None that I am aware

27  of at this point in time.

6

1      **PRESIDING COMMISSIONER DAVIS:**

2    Mr. Phillips, are you satisfied that your client

3    can participate in the hearing today?

4           **ATTORNEY PHILLIPS:**  Yes, I am.

5           **PRESIDING COMMISSIONER DAVIS:**  Very good.

6    This hearing is being conducted pursuant to

7    Penal Code Sections 3041 and 3042 and the rules

8    and regulations of the Board of Prison Terms

9    governing parole consideration hearings for life

10   inmates.  The purpose of the today's hearing is

11   to consider the number and nature of the crimes

12   you were committed for, your prior criminal and

13   social history and your behavior and programming

14   since your commitment.  We have had the

15   opportunity to review your File and you will be

16   given an opportunity to correct or clarify any

17   issues as we move along.  We will reach a

18   decision today and inform you whether or not we

19   find you suitable for parole and the reasons for

20   that decision.  If you are found suitable for

21   parole the length of your confinement will be

22   explained to you.  Before we go any further I

23   want to advise you that we expect you to be

24   totally honest with us today.  If you do not get

25   a date today this hearing will form the

26   foundation of all future hearings.  Any false

27   statements that you make could have an adverse

7

1    effect on your ability to get a date in the

2    future.  Now what that means is today we're

3.   setting a record today.  And so now is -- Today

4    is the day that if you want to make a change

5    someplace or if you have realized something that

6    you didn't say before, this is the time to do

7    it.  Does that make sense?

8         INMATE HERNANDEZ:  It makes sense.

9         PRESIDING COMMISSIONER DAVIS:  Okay.

10   Nothing that happens today will change the

11   finding of the court.  We are not here to retry

12   your case.  We are here to determine if you are

13   suitable for parole.  Do you understand that?

14        INMATE HERNANDEZ:  I understand that.

15        PRESIDING COMMISSIONER DAVIS:  All right.

16   This hearing is being, will be conducted in two

17   phases.  I will discuss with you the crime for

18   which you are committed, your prior criminal and

19   social history.  Commissioner Smith will discuss

20   with you your progress since your commitment,

21   your counselor's report, psychological

22   evaluation, parole plans and any letters of

23   support that might, that you might have.  Once

24   that is concluded the Commissioners and the

25   district attorney and your attorney will have an

26   opportunity to ask questions.  The questions

27   from the district attorney will be asked through

8

1    the panel and your answers should be directed

2    back to the panel.  Before we recess for

3    deliberations the district attorney, your

4    attorney and you will be given an opportunity to

5    make a final statement regarding your

6    suitability.  We will then recess to deliberate,

7    after which we will resume the hearing and

8    announce the decision.  The California Code of

9    Regulations states that regardless of time

10   served a life inmate shall be found suitable for

11   parole -- unsuitable for parole and denied

12   parole if in the judgment of the panel the

13   inmate would pose an unreasonable danger to

14   society if released from prison.  Can we take

15   just one minute?  This is just going to -- Can

16   we see if we can eliminate -- I'm concerned that

17   we may not be able to get a good recording.

18                  (Off the record.)

19         DEPUTY COMMISSIONER SMITH:  Okay, we're

20   back on.

21         PRESIDING COMMISSIONER DAVIS:  We're back

22   on.  All right, now so we've corrected the

23   technical difficulty with the heater here so

24   we'll be back, we are back on the record.  The

25   California Code of Regulations states that

26   regardless of time, regardless of time served

27   the life inmate shall be found unsuitable for

9

1  and denied parole if in the judgment of the

2  panel the inmate would pose an unreasonable risk

3  of danger to society if released from prison.

4  You have certain rights.  Those rights include

5  the right to a timely notice of all hearings,

6  the right to review your Central File and the

7  right to present relevant documents.

8  Mr. Phillips, are you satisfied that your

9  client's rights have been met for the purposes

10 of this hearing?

11         ATTORNEY PHILLIPS:  Yes your honor, yes.

12         PRESIDING COMMISSIONER DAVIS:  You have

13 an additional right to be heard by an impartial

14 panel.  Mr. Hernandez, you have heard Mr. Smith

15 and I introduced this morning.  Is there

16 anything -- Do you object to either one of us

17 hearing today?

18         INMATE HERNANDEZ:  I do not object to

19 either one of you at this hearing.

20         PRESIDING COMMISSIONER DAVIS:  Thank you.

21 You will receive a written copy of our tentative

22 decision today.  The decision becomes effective

23 within 120 days.  A copy of that tentative

24 decision and a copy of the transcript will be

25 sent to you and you will have 90 days from that

26 date to appeal if you so desire.  You are not

27 required to admit your offense or discuss your

10

1  offense.  However, this panel does accept the

2  findings of the court to be true.  And we've

3  already covered that but you understand that,

4  correct?

5       INMATE HERNANDEZ:  Yes sir.

6       PRESIDING COMMISSIONER DAVIS:  Thank you.

7  The Board has eliminated its appeal process.  If

8  you disagree with anything in today's hearing

9  you have the right to go directly to the court

10 with your complaint.  Commissioner Smith, do we

11 have any confidential information with which

12 we'll be dealing today?

13      DEPUTY COMMISSIONER SMITH:  There is no

14 confidential information in the file.

15      PRESIDING COMMISSIONER DAVIS:  Thank you.

16 Mr. Phillips, do you have any additional

17 documents that you wish to submit today?

18      ATTORNEY PHILLIPS:  Well I believe that

19 the Commissioners already have these documents

20 and if they do then I apologize for duplication.

21 These are laudatory chronos that we'd want to

22 submit.

23      PRESIDING COMMISSIONER DAVIS:  Those

24 should be in the Central File but we can make

25 sure that all of the ones that you have are the

26 same ones that we have.

27      ATTORNEY PHILLIPS:  Yes, they are in the

11

1   Central File, I verified that, but I just wanted

2   to make sure that those -- there are a total of

3   eight laudatory chronos and an additional two

4   laudatory work reports.

5           PRESIDING COMMISSIONER DAVIS:    Is that

6   it?

7           ATTORNEY PHILLIPS:    That's it, yes.

8           PRESIDING COMMISSIONER DAVIS:    District

9   Attorney Gust, did you have anything that you

10  want to submit today?

11          DEPUTY DISTRICT ATTORNEY GUST:    Nothing

12  additional.

13          PRESIDING COMMISSIONER DAVIS:    Okay.    We

14  do have a copy of a letter from Deputy District

15  Attorney Richard Sachs with an attached follow-

16  up investigative report.    It looks like a series

17  of investigative reports concerning this crime

18  that are dated 3/24/06 at 4 p.m.    If there are

19  no objections I will just go ahead and add those

20  to the documents that will be part of this

21  record.

22          ATTORNEY PHILLIPS:    No objection.

23          PRESIDING COMMISSIONER DAVIS:    I have a

24  list of the documents that we'll be covering

25  today.    Mr. Phillips, if you would like to look

26  at that list and see if that, see if you have,

27  make sure you have all those documents.

12

1    ATTORNEY PHILLIPS:  Yes, we have those

2 documents.

3    PRESIDING COMMISSIONER DAVIS:  All right,

4 we will be marking that Exhibit One.  And

5 Ms. Gust, I'm assuming that you also have those

6 documents.

7    DEPUTY DISTRICT ATTORNEY GUST:  Yes, I

8 believe we do have them.

9    DEPUTY COMMISSIONER SMITH:  Excuse me,

10 Commissioner, let me ask counsel.  If you have

11 these would you initial this for us, please.

12    ATTORNEY PHILLIPS:  Yes.  And you know, I

13 realized I was going to wait until we got into

14 the discussion of some of the particulars of the

15 documents that are contained in the Board's

16 information but I do have a couple of other

17 documents that I'll be offering.  I don't know

18 if you want me to offer those now or wait until

19 we get into the discussion about them.

20    PRESIDING COMMISSIONER DAVIS:  I think

21 we'd like to see what you have first.

22    ATTORNEY PHILLIPS:  Okay, all right, I'll

23 do that.

24    PRESIDING COMMISSIONER DAVIS:  Just

25 anywhere on the table is fine.

26    ATTORNEY PHILLIPS:  Anyplace?

27    PRESIDING COMMISSIONER DAVIS:  Yes.

13

1        **ATTORNEY PHILLIPS:**  Okay.  And today is

2    the 27th.  All right, there is that.

3        **DEPUTY COMMISSIONER SMITH:**  Thank you,

4    counsel.

5        **ATTORNEY PHILLIPS:**  And then what I have

6    is I have a copy of a letter that I wrote to

7    Bill Zika, who is the psychologist, who is the

8    supervising psychologist for the report that was

9    written and also a copy of the CDC form 602 that

10   Mr. Hernandez had submitted prior to that.  And

11   that's going to become more important when we

12   talk about the specific issues of the mental

13   evaluation.

14       **DEPUTY COMMISSIONER SMITH:**  Counsel, when

15   I review the psych evaluation I will then give

16   you and Mr. Hernandez the opportunity to make

17   any comments that you'd like to make regarding

18   that evaluation.  That would be the time, rather

19   than presenting the letters to us, to simply

20   verbally address those letters.

21       **ATTORNEY PHILLIPS:**  All right.

22       **DEPUTY COMMISSIONER SMITH:**  And if

23   Mr. Hernandez, as you indicated, has filed a 602

24   regarding the evaluation.

25       **ATTORNEY PHILLIPS:**  That's correct.

26       **DEPUTY COMMISSIONER SMITH:**  Then he can

27   simply make mention that a 602 has been filed

14

1   without going into any of the particulars.

2   Because we won't get involved in any 602

3   actions, that's between Mr. Hernandez and the

4   institution.   And we wouldn't want Mr. Hernandez

5   to say anything on the record or for us to place

6   anything on the record that could necessarily be

7   weighed either favorably or negatively in the

8   602 process.

9           ATTORNEY PHILLIPS:   Okay.

10          DEPUTY COMMISSIONER SMITH:   Okay?

11  Anything questions about any of my reasoning?

12          ATTORNEY PHILLIPS:   No.   No, we'll just

13  wait until we get to that, thanks.

14          DEPUTY COMMISSIONER SMITH:   Okay.

15          PRESIDING COMMISSIONER DAVIS:

16  Mr. Phillips, will Mr. Hernandez be speaking to

17  us today?

18          ATTORNEY PHILLIPS:   He will not be

19  discussing the offense.   We've talked about that

20  at length.   He understands that you, that the

21  conviction is there, that the convictions are

22  there, and that you will need to look at those

23  as decisions and not retry the case, just like

24  you were referring to earlier.   So he won't be

25  discussing the facts and circumstances around

26  the allegations as they came up back in 1995.

27          PRESIDING COMMISSIONER DAVIS:   But he may

15

1    be answering other questions?

2         **ATTORNEY PHILLIPS:**  Yes.

3         **PRESIDING COMMISSIONER DAVIS:**  In that

4    case I will go ahead and swear you in,

5    Mr. Hernandez.  If you'd raise your right hand

6    please sir.  Do you solemnly swear or affirm

7    that the testimony you will give at this hearing

8    will be the truth and nothing but the truth?

9         **INMATE HERNANDEZ:**  I do.

10         **PRESIDING COMMISSIONER DAVIS:**  All right.

11   And I am going to go to the Court of Appeals

12   Decision.  This is the Court of Appeals Fourth

13   Appellate District Division One State of

14   California dated April 14, 1998.  And beginning

15   on page three under the Factual and Procedural

16   Background it starts with a couple, actually

17   three footnotes on that one page.  The first

18   footnote as to the very top and the procedural

19   background.  The footnote states:

20             "We note Hernandez's opening brief

21             is defective under California

22             Rules of Court Rule 13 as it fails

23             to summarize the material facts

24             but rather recites a summary of

25             testimony witness to witness.  See

26             *Lord v. Henderson, 1951, 105 Cal.*

27             *App. 2d 426, 443 through 444.*

16

```
 1              Nevertheless pursuant to
 2              California Rules of Court Rule 18
 3              we disregard the defect and
 4              consider the brief as it was
 5              properly prepared."
 6   And it goes on to cite the specifics of this
 7   case.
 8              "Christine Wolf and Hernandez
 9              cohabitated for two years until
10              early 1955 (sic).  They continued
11              to see each other even though Wolf
12              had moved in with Gary Tolle, T-O-
13              L-L-E, and Hernandez, H-E-R-N-A-N-
14              D-E-Z, was seeing Raquel McDowell,
15              capital M-C capital D-O-W-E-L-L.
16              In August Wolf moved in with her
17              grandmother, Jean Russell, R-U-S-
18              S-E-L-L.  Around the first of
19              November Wolf and Hernandez had a
20              heated argument over the phone.
21              Afterwards Hernandez paged Wolf so
22              many times she was forced to
23              deactivate her pager.  Wolf also
24              received anonymous threatening
25              phone calls but recognized
26              Hernandez's voice.  During
27              November Wolf received a letter
```

17

1        addressed to, quote, Chris, close

2        quotes --"

3   And at a footnote cited with number three it

4   says:

5        "Wolf testified Hernandez

6        frequently but not always

7        misspelled her name in this way."

8   Going back to the text.

9   "-- containing text cut from a magazine and

10  pasted on the paper.  Part of the note read,

11  quote, we guarantee you and --"

12  Then it cites a series of numbers.

13  "11-0-3-54, a friend will die, dot, dot, dot,

14  dot, now pay or play, 11-33-0-0.  Period, close

15  quotes."

16  And it also footnotes number four.

17        "Although they did not know each

18        other Hernandez began harassing

19        his neighbors, James and Julie

20        Sutton in late December.

21        Hernandez lived at 11330 El Nopal.

22        That's capital E-L capital N-O-P-

23        A-L.  And the Suttons lived three

24        doors away at 1154.  Following

25        police advice Wolf moved from

26        Russell's home.  Russell received

27        several phone calls after Wolf

18

```
 1          moved.  On the morning of December
 2          21 Julie Sutton discovered an
 3          arrow from a crossbow,
 4          parentheses, called a quote, bolt,
 5          close quotes, close parentheses,
 6          lodged in the door of her
 7          daughter's bedroom as the child
 8          slept.  The window had been
 9          smashed and the curtain was torn.
10          They also found a gallon-size milk
11          jug containing gasoline on the
12          roof of Sutton's house.  Gasoline
13          had leaked from the jug through a
14          downspout and pooled beneath the
15          window.  A length of maroon velour
16          material protruded from the jug.
17          The fire investigator suspected it
18          was a sash from a bathrobe and was
19          intended to be a wick.  It had not
20          been lit.  The Suttons were
21          frightened and moved their motor
22          home in front of their children's
23          bedroom window.  On Christmas Eve
24          Julie Sutton's son brought her
25          another bolt he found stuck in the
26          ground.  He also found a bolt
27          lodged in the skin of the motor
```

19

1    home.  One near the kitchen window
2    and another in the ground, which
3    went through and tore the motor
4    home's windshield cover.
5    Sheriff's deputies canvassed the
6    neighborhood and discovered
7    another bolt lodged between the
8    shingles of the house two doors to
9    the west of the Suttons' house.
10   Later that night Russell was
11   awakened at her home by a, quote,
12   glow, close quotes, coming from
13   the area of the front door.  When
14   she opened the door she found a
15   passerby about to put out the fire
16   on the doorway with a garden hose.
17   An arson investigator believed the
18   fire was started with a bottle of
19   STP gas treatment.  Early in the
20   morning of January 3, 1996 Dan
21   Tolle went outside his home to see
22   why his dogs were barking.  He
23   found his son Gary's boat engulfed
24   in flames.  He put the flames out
25   with a hose and called the fire
26   department.  Fire investigators
27   determined that the fire was not

20

```
 1        accidental.  Later that morning
 2        Tolle's neighbor showed him a
 3        suspicious package that he found
 4        near Tolle's house and the boat.
 5        The sheriffs were called.  This
 6        package was found to contain a
 7        cottage cheese and pineapple
 8        container covered with a coffee
 9        filter held down by medical tape.
10        Inside the container were two more
11        coffee filters holding smokeless
12        powder and shotgun pellets.  It
13        had a shoelace for a fuse.  Had
14        the shoelace been lit it probably
15        would have flared up sending
16        pellets a short distance.
17        Although dangerous it was
18        technically not an explosive
19        device.  Then on the afternoon of
20        January 6th twelve-year-old Tory
21        (phonetic) Tolle, T-O-L-L-E, Dan's
22        granddaughter and Gary's niece,
23        was watering the rose bushes in
24        front of Dan's house when she
25        heard a whistling sound next to
26        her head.  She turned to look in
27        the direction of the sound and saw
```

21

1        a bolt sticking out of the side of

2        the house.  It had missed her head

3        by only a few inches.  She then

4        saw a thin man with a mustache

5        wearing a black baseball cap and a

6        gray thermal shirt running down

7        the road away from the house.

8        Detective Myers, (phonetic) who

9        earlier had participated in the

10       investigation at the Suttons'

11       house investigated this incident.

12       Wolf later arrived at the Tolle

13       house and spoke to him.  He

14       noticed Tory and Wolf were similar

15       in height, weight and hair color.

16       Hernandez, the prime suspect in

17       the shooting, was found hiding on

18       the floor of his car, which

19       McDowell was driving.  Hernandez's

20       vehicle contained a receipt made

21       out to him with the address of the

22       Tolle home written on the back and

23       a tablet bearing the license plate

24       number of the Suttons and their

25       neighbors' car.  Next to

26       Mrs. Sutton's plate number was a

27       physical description which roughly

22

1         corresponded to her appearance.
2         As such -- Excuse me.  A search of
3         Hernandez's home produced a box of
4         crossbows -- excuse me -- a box
5         for a crossbow which shot the type
6         of bolt found at the Sutton and
7         Tolle homes, coffee filters,
8         shotgun pellets, smokeless powder
9         and medical tape of the same type
10        as that used in the device found
11        near the Tolle home; a cottage
12        cheese and pineapple container in
13        the refrigerator, though of a
14        smaller size than that found at
15        the Tolle home, a maroon bathrobe
16        missing its sash, a gray
17        sweatshirt, a black baseball cap,
18        and a pile of empty one-gallon
19        milk jugs.  No crossbow was ever
20        found.  Hernandez denied owning a
21        crossbow.  When he was confronted
22        with the box he claimed he was the
23        victim of a police conspiracy.
24        Hernandez was charged with twice
25        vandalizing the Suttons' home and
26        attempting to burn it, attempting
27        to murder Tory, possessing a

23

```
 1          destructive device found near the
 2          Tolle home and stalking Christine
 3          Wolf.  He was not charged with
 4          making harassing phone calls, the
 5          boat burning or burning
 6          Mrs. Russell's door."
 7   Let me start that again.  The sentence is:
 8          "He was not charged with making
 9          harassing phone calls, the boat
10          burning or burning Mrs. Russell's
11          door.  The fingerprints were found
12          on the handwritten -- His
13          fingerprints were found on the
14          handwritten note with the license
15          numbers, the envelope of the
16          letter sent to Wolf, the crossbow
17          box and the cottage cheese
18          container found near the Tolle
19          home.  He presented an alibi
20          defense but did not testify."
21   Mr. Hernandez, do you know any of the sheriff's
22   deputies or any of the law enforcement officials
23   that were associated with your case?
24          INMATE HERNANDEZ:  I won't be discussing
25   any parts of this crime or any elements of the
26   crime.  That would include the individuals
27   responsible for the investigation.
```

24

1        **PRESIDING COMMISSIONER DAVIS:**  Okay.  So

2    you don't want to, you don't even want to say if

3    you knew the officers or not?

4        **INMATE HERNANDEZ:**  I will not be

5    participating in this.

6        **PRESIDING COMMISSIONER DAVIS:**  Okay.

7    Let's move on.  In terms of your personal

8    history significant family information I'm

9    referring here to page ten in the legal

10   documents.  And I believe this is the parole

11   officer's report.  It says, this 38-year-old

12   defendant was born in San Antonio, Texas but has

13   resided in San Diego County since age four.  He

14   never knew his natural father and his mother

15   remarried when he was eight years old to Ernest

16   Palensky, P-A-L-E-N-S-K-Y.  He is the oldest of

17   seven children and considers his childhood and

18   upbringing as good.  He did not experience any

19   abuse and was not exposed to substance abuse in

20   his family.  No criminal history in the family

21   according to this report.  In terms of

22   education, graduated from Santana High School

23   where he was the sophomore class president and

24   was the California state wrestling champion in

25   his weight class.  In terms of prior employment,

26   he has been employed as a floor-covering

27   contractor for the last 12 years and was a

25

1  member of the San Diego Floor Covering

2  Association for the past four years.  Prior to

3  the instant offense his business was in

4  financial problems and he had $10,000 worth of

5  unrecoverable funds outstanding.  In October

6  1995 he began to work with his girlfriend's

7  animal lab.  You had at the time a six-year-old

8  daughter that resided with her mother.  Is that

9  still correct?  How old is your daughter now,

10  sir?

11        INMATE HERNANDEZ:  Yesterday my daughter

12  turned 17.

13        PRESIDING COMMISSIONER DAVIS:  And she's

14  still living with her mother?

15        INMATE HERNANDEZ:  That's correct.

16        PRESIDING COMMISSIONER DAVIS:  Joined the

17  United States Army in 1977 and spent nine months

18  in the 82nd Airborne Division.  However, on his

19  thirteenth jump hurt his back and did not want

20  to simply sit at a desk for the next year.

21  Therefore he took a discharge by waiving his

22  medical and did not qualify for VA benefits.  At

23  the time you had been married and divorced three

24  times.  The first marriage ending in divorce due

25  to the fact that both of them were too young.

26  The second divorce involved a woman 13 years his

27  senior who the defendant divorced due to alcohol

26

1    problems.  His third marriage was Rhonda -- Is

2    that Heindly, H-E-I-N-D-L-Y, Heindly?  How do

3    you pronounce that, Mr. Hernandez?

4         INMATE HERNANDEZ:  That's what the last

5    name is on this information but to be honest

6    with you I don't recall her maiden name.

7         PRESIDING COMMISSIONER DAVIS:  Okay.  It

8    lasted about seven years, after which they

9    divorced in 1992.  He states that he had become

10   a workaholic during his marriage and that there

11   was one incident of domestic violence with

12   Rhonda.  According to this it says that alcohol

13   had never been a problem for you, that you

14   smoked marijuana about six times in high school.

15   In late 1991 until '94 began using

16   methamphetamine and described your use as very

17   mild.  Stated he began using the substance about

18   every other weekend when he met Christine Wolf

19   and for a six month period, for a six month

20   period prior to their breakup in 1995 he was

21   using the substance about every two or three

22   days.  Does that sound about accurate as far as

23   your recollection of your use of alcohol or

24   drugs?

25        INMATE HERNANDEZ:  I stipulate to the

26   probation officer's report.

27        ATTORNEY PHILLIPS:  Okay.

27

1           PRESIDING COMMISSIONER DAVIS:   In terms

2     of -- denies any gang affiliation.   It says, the

3     defendant stated that he had never spent any

4     time in jail before the instant offense and had

5     always lived a productive life.   In fact he has

6     received commendations from various

7     organizations.   He donated labor and floor

8     covering materials to organizations like the

9     battered women's shelter in Escondido, the

10    Santee Little League and something called H-O-M.

11    What is H-O-M?

12          INMATE HERNANDEZ:   That would be the

13    House of Metamorphosis.

14          PRESIDING COMMISSIONER DAVIS:   Oh, house,

15    okay.

16          INMATE HERNANDEZ:   It's a drug rehab

17    facility that contacted me in regards to re-

18    covering their entire facility.

19          PRESIDING COMMISSIONER DAVIS:   In

20    downtown San Diego.

21          INMATE HERNANDEZ:   It is, sir.

22          PRESIDING COMMISSIONER DAVIS:   Yes.   And

23    how did they come to contact you?

24          INMATE HERNANDEZ:   A vendor of mine had

25    actually approached me.   They had called him for

26    some services and he was unable to provide those

27    services in a lucrative manner and he wasn't in

28

1   any position to donate any materials or labor.

2   He approached me in regards to that.  I at that

3   time took it upon myself to meet the organizer.

4   Doris was doing an admirable job in her pursuit

5   to rehabilitate and to provide a better, safe

6   home so I donated enough material to carpet both

7   the male and female dorms, the administration

8   area and the stairwell.

9        PRESIDING COMMISSIONER DAVIS:  Okay.  But

10  it's strictly a business contact.

11       INMATE HERNANDEZ:  It was strictly a

12  business contact, yes sir.

13       PRESIDING COMMISSIONER DAVIS:  Okay.  So

14  you said you stipulated to the report.  Is there

15  anything that doesn't sound right to you or that

16  you want to add or amplify?

17       INMATE HERNANDEZ:  As I've said, I just

18  stipulate to the report as it sits right now.

19       PRESIDING COMMISSIONER DAVIS:  Okay.  Was

20  the use of -- Did methamphetamine become a

21  problem for you when you were using it as it

22  says here every two or three days?

23       ATTORNEY PHILLIPS:  I don't know if he is

24  in a position really to answer that question and

25  I would advise him not to answer.

26       PRESIDING COMMISSIONER DAVIS:  Okay.  All

27  right, then I'll ask you to turn your attention

29

1   to Commissioner Smith.

2          **DEPUTY COMMISSIONER SMITH:**

3   Mr. Hernandez, I am going to comment on your

4   employment plans, the residential plans and go

5   through the letters.  And then I'll go back and

6   do a review of the adjustment, of your

7   institutional adjustment, and then I'll finish

8   up with the psychological evaluation.  Regarding

9   plans, referring to the Board report indicates

10  that you lived with your mother, Sophia

11  Palensky, P-A-L-E-N-S-K-Y, and your sister Susan

12  Jarcki, J-A-R-C-K-I.  Did I understand you to

13  say earlier that your mother has recently passed

14  away?

15         **INMATE HERNANDEZ:**  Yes sir, she has, she

16  passed in August of last year.

17         **DEPUTY COMMISSIONER SMITH:**  Okay, our

18  sympathies.

19         **INMATE HERNANDEZ:**  Thank you sir.

20         **DEPUTY COMMISSIONER SMITH:**  So your plans

21  would be to live with your sister then still?

22         **INMATE HERNANDEZ:**  Yes sir.  She would --

23  she provided a letter.  It's dated August 31st.

24         **DEPUTY COMMISSIONER SMITH:**  And I'll

25  address that.

26         **INMATE HERNANDEZ:**  Okay.

27         **DEPUTY COMMISSIONER SMITH:**  I know that

30

1    it's in here but I just wanted to --

2          INMATE HERNANDEZ:  Okay.

3          DEPUTY COMMISSIONER SMITH:  -- to

4    clarify.

5          INMATE HERNANDEZ:  Thank you sir.

6          DEPUTY COMMISSIONER SMITH:  And I don't

7    mind your helping me out.

8          INMATE HERNANDEZ:  Thank you sir.

9          DEPUTY COMMISSIONER SMITH:  Okay?

10         INMATE HERNANDEZ:  Thank you very much.

11         DEPUTY COMMISSIONER SMITH:  And your

12   sister is married so the letter is both from she

13   and her husband Jim, correct?

14         INMATE HERNANDEZ:  Yes sir.

15         PRESIDING COMMISSIONER DAVIS:  Okay.  And

16   with regard to employment it says that you plan

17   on working as a flooring carpeter or in small

18   engine repair.  When I again get to the letter

19   from your sister and her husband they're talking

20   about a different type of employment; is that

21   right?

22         INMATE HERNANDEZ:  They were talking

23   about construction employment, yes sir.

24         DEPUTY COMMISSIONER SMITH:  Okay.  So

25   what's your long-range plan?

26         INMATE HERNANDEZ:  My long-range plan

27   would be to begin work with my brother-in-law in