# EXHIBIT 3
# Part 2 of 3

1  GROUND 10 FACTS CONTINUED:

2  (P 4 Cont.)

3           [Reasons For Multi-Year Parole Denial]

4  p. 67 l 17-26

5     "In a seperate decision ... The specific reasons

6  are as follows ... [1] multiple victims from

7  seperate instances ... [2] The motive for this

8  crime remains inexplicable ... [3] The prisoner

9  has programmed in a limited manner ...

10  [4] There was one serious disciplinary ...

11  [5] You have not sufficiently participated

12  in self-help programs. We also note that the

13  p. 68 l 1-20

14     [6] psychiatrists report dated 1/20/06 prepared

15  by Laura Petracek is not totally supportive in

16  that within a controlled setting he has a risk

17  of minimal — — the risk is minimal compared

18  to that of the average inmate. IF released into

19  the community his violence risk is slightly

20  higher compared to the average citizen. Signif-

21  icant risk factors and precursors to violence

22  are his past alchohol and substance abuse ...

23  [7] Although he has been disciplinary-free

24  since his incarceration he still denies any

25  responsibility for his crime. This evaluator

26  feels that the inmate needs to do some

27  soul-searching before he is eligible for

28  release ... [8] Under remarks, the prisoner's

   gains are recent and he must demonstrate the

   ability to maintain those gains over an

   extended period of time."

[5] Petitioner adopts and incorporates, as if fully stated

   herein, the Ground 1 through Ground 9 facts

   inclusive of associated Points and Authorities.

8. Did you appeal from the conviction, sentence, or commitment?  ☒ Yes.  ☐ No.  If yes, give the following information:
   a  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court").

   b  Result _____  c  Date of decision. _____

   d.  Case number or citation of opinion, if known: _____

   e.  Issues raised:  (1) _____

       (2) _____

       (3) _____

   f.  Were you represented by counsel on appeal?  ☒ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9  Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:

   a  Result. _____  b.  Date of decision: _____

   c.  Case number or citation of opinion, if known: _____

   d.  Issues raised:  (1) _____

       (2) _____

       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal.
    NOT APPLICABLE

    _____

    _____

11 Administrative Review:
   a  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   The Board of Parole Hearings on/after May of 2004 has
   repealed its Appeals Review Unit, thus the doctrine
   of exhausted Administrative remedies does not apply.
   Concerned Cit. of Palm Desert, Inc. -v- Riverside Cty. Bd. of S. (Cal.App.
   4TH Dist. Div. 2 1974) 113 Cal.Rptr. 338, 343: "The rule that a party must
   exhaust his administrative remedies before seeking judicial relief
   has no application where no administrative remedy existed."
   (Ramos -v- County of Madera 4 Cal.3d 685, 691, Diaz -v- Quitoriano
   268 Cal.App. 2d 807, 812)
   b  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No. SEE ¶ 11 a., supra.
      Attach documents that show you have exhausted your administrative remedies.

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13 a  (1) Name of court: _____

     (2) Nature of proceeding (for example, "habeas corpus petition"): _____

     (3) Issues raised· (a) _____

         (b) _____

     (4) Result (Attach order or explain why unavailable): _____

     (5) Date of decision: _____

   b. (1) Name of court: _____

     (2) Nature of proceeding: _____

     (3) Issues raised· (a) _____

         (b) _____

     (4) Result (Attach order or explain why unavailable): _____

     (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result.

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

There is no unreasonable delay. Transcripts final July 24, 2006 and due to mandated work schedule, library closures, lockdowns, et cetera, I have sent as soon as factual/legal basis known to me on all grounds.

16 Are you presently represented by counsel? ☐ Yes. ☒ No If yes, state the attorney's name and address, if known:

_____

17 Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

According to In Re Roberts (2005) 36 Cal. 4th 575 (challenges to denial of parole are to be adjudicated in court that rendered judgement)

I, the undersigned, say· I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date. 12/20/2006                    ✗_____
                                    (SIGNATURE OF PETITIONER)

1  JESSE HERNANDEZ (K-21116)
2  GW-109 -4P , CTF-SOLEDAD (CENTRAL)
   P.O. BOX 689
3  SOLEDAD , CA 93960-0689
4     (IN PRO PER)

5

6

7

8        IN THE SAN DIEGO COUNTY SUPERIOR COURT
9     IN AND FOR THE STATE OF CALIFORNIA

10

11

12

13  IN RE JESSE HERNANDEZ ON H.C.    RE: AMENDMENT / SUPPLEMENT
14   (JESSE HERNANDEZ - PETITIONER)      TO PETITION FOR WRIT
              -V-                          OF HABEAS CORPUS
15   ( B. CURRY      , WARDEN (RESP.)  (EVIDENTIARY HEARING REQUESTED)

16                        I.

17                  INTRODUCTION
18  Petitioner is before this Court regarding the
19  Board of Parole Hearings' actions of alleged violations
20  of regulatory /statutory guidelines in violation of
21  procedural due process.
22     He challenges all of the Board's actions occuring
23  at the 3/26/2006 Parole Hearing, as delineated in
24  specified Grounds.

25

26

27

28

                        27

## II

### JURISDICTION

Jurisdiction is appropriate under Cal. Penal Code § 1473 et seq., and California Constitution's Article VI, Section 10.

## III

### VENUE

Venue is appropriate in the County of Commitment per the California Supreme Court's decision in In Re Roberts (2005) 36 Cal. 4TH 575.

## IV

### PARTIES

I, Jesse Hernandez (Petitioner), am incarcerated in the California prison system due to criminal conviction by jury out of San Diego County. I was remanded to the care and custody of the Director of Corrections in year of '96.

B. Curry_____, Warden____, is the current agent/employee of the California Department of Corrections and Rehabilitation, under supervision of the Secretary of the CDCR, who has the present/actual custody and control of Petitioner in Monterey County, California at Correctional Training Facility - Soledad.

## V

### FACTS

FACTS FROM PAGE _3_ TO PAGE _23_ (GROUNDS _1_ TO _10_) ARE INCORPORATED AND ADOPTED BY REFERENCE.

## VI.
## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.

Petitioner contends the holding of Superintendent ...—v— Hill (1985) 472 US 445, 105 S.Ct. 2768 was violated when parole denied by use of factor of non-applicable circumstance of unsuitability; thus, it was arbitrary and capricious to manipulate the regulatory restriction contrary to liberty interest in fundamental fairness.

In Superintendent, Mass. Corr. Inst. —v— Hill (1985) 105 S.Ct. 2768, 2774, 472 US 445:

"We hold that the requirements of due process are satisfied if some evidence supports the decision ... This standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced ... [T]he relevant question is whether there is any evidence in the record that could support the conclusion ... The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions ... that have some basis in fact." [Emphasis Added].

In this particular case, the Board surmised that: "That is, first, there are multiple victims in separate incidences."

However, this Court has to remember that In Re Rosen Krantz (2002) 128 Cal. Rptr. 2d 104, 138, 29 Cal. 4th 616 cert. denied 123 S.Ct. 1808, 155 L.Ed.2d 669 held:

"Parole Applicants in this state have an expectation that they will be granted parole unless ... they are unsuitable for parole in light of the circumstances specified by statute and by regulation." [E.A.]

29

VII.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2  (1. Cont.)

3  Harmonizing with Rosenkrantz, supra, the California

4  Supreme Court, in In Re John E. Dannenberg (2005) 34 Cal. 4th

5  1061, 23 Cal. Rptr. 3d 417:

6     "[Penal Code] Section 3041 addresses how the Board
7     is to make parole decisions for indeterminate
      life inmates.... [A] In response to these
8     requirements, the Board has adopted regulations
      covering the various categories of indeterminate
9     life inmates.... [A] The regulations do set detailed
10    standards and criteria for determining whether
11    a murderer with an indeterminate life sentence
12    is suitable for parole." [E.A.]

13  As the Board's CCR§ 2400 et seq Guidelines apply

14  to Petitioner's case, also, they should adhere to the strictures

15  of their own guidelines. Terhune -v- Sup. Ct. (Whitley) (1998)

16  65 Cal. App. 4th 864, 872: "[A]dministrative actions exceeding

17  those powers are void."

18  In CCR § 2402 (c) (1) (A), as a factor to prove the CCR

19  §2402 (c)(1) — see infra — circumstance #1(A) provides:

20    "Multiple victims were attacked, injured or killed
      in the same or separate incidents."

21  Therefore, CCR§ 2402(c)(1)(A) can only be applicable

22  as a factor when CCR§ 2402(c)(1) is proved as follows:

23    "Commitment Offense. The prisoner committed the
24    offense in an especially heinous, atrocious or cruel
      manner. The factors to be considered include:"

25  In Re DeLuna (Cal. App. 6th Dist. 2005) 24 Cal. Rptr. 3d 643,

26  649-50:

27    "We must confine our review to the stated factors
28    found by the Board, and all the evidence presented
                                                    [cont.]

30

## VI.
MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(1 cont.)

at the parole hearing which is relevant to those findings C.J" C.E.A.J

Here, the Board did not even allege the CCR§ 2402(c)(1) finding, as it couldn't. This makes finding 'arbitrary and capricious'.

Daniels -v- Williams (1986) 106 S.Ct. 662, 665, 474 US 332

" By requiring the government to follow appropriate procedures when its agents decide to " deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them, ..., it serves to prevent governmental power from being "used for purposes of oppression C.J"

Herewith, Petitioner has proved how the Board's decision violated his right to procedural due process under the 14TH Amendment's Due Process clause. Also he has established how due process under the Cal. Const. was violated by arbitrary use of factor not applicable to unalleged circumstance. Coextensively, these clauses overlap in the aforementioned analysis.

In Hamdi -v- Rumsfeld (2004) 542 US 507, 537, 124 S.Ct. 2633; "CWJe have utilized the "some evidence" standard in the past as a standard of review, not a standard of proof."

People -v- Cluff (Cal. App. 1st. Dist. 2001) 105 Cal Rptr 2d 80, 83;

" CAJll exercises of legal discretion must be grounded in reasoned judgement and guided by legal principles and policies appropriate to the particular matter at issue." CCites omitted) The Board's actions were disingenuous to the governing law.

31

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                              2.

3  Petitioner contends that the use of
4  "motive" to deny parole violated the
   Morrissey -v- Brewer (1972) 408US
5  471, 481, 92 S.Ct. 2593 holding that
6  procedural protections be followed
   which the situation demands.

7

8  In Morrissey -v- Brewer (1972) 408US471,481,92 S.Ct 2593, 2600,
9  33 L.Ed 2d 484, the High Court held: "[D]ue process is flexible
10 and calls for such procedural protections as the particular
11 situation demands." At the Parole Consideration Hearing
12 situation, the Board must adhere to their Regulations (see,
13 e.g. In re Rosenkrantz, supra, In re Dannenberg, supra).

14  Simply put, the Board is not permitted to put the cart
15 before the horse.

16  Here, the Board denied parole by stating (as related to motive):
17 "The motive of this crime remains inexplicable in
18  that we still don't have a clear understanding
    of why these crimes occurred, except for Mr.
19  Hernandez's desire to control Ms. Wolf."

20  Therefore, it is unequivocally implied that the Board was
21 attempting to use CCR§2402(c)(1),(E) which states:
22 "Commitment offense. The prisoner committed the offense
23  in an especially heinous, atrocious or cruel manner.
    The factors to be considered include: * * * [1](E)
24  The motive for the crime is inexplicable or very
25  trivial in relation to the offense."

26  Minimally, the Board has punished Petitioner for invoking
27 his right under Penal Code §5011(b), which states:

28

                              32

## VI.

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(2 cont.)

"The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Parallels Amend. 5 "witness against self" clause.

Notwithstanding the absolute right under Pen. Code § 5011, In Re George Scott (Cal. App. 1st Dist. 2004) 119 Cal. App. 4th 871, 15 Cal. Rptr. 3d 32:

"An "inexplicable" motive, as we understand it, is one that is unexplained or unintelligible, as where the commitment offense does not appear to be related to the conduct of the victim and has no other discernable purpose. A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous."

In arguendo, without admitting the accuracy or truth, the Board itself concluded the motive was for "Mr. Hernandez's desire to control Ms. Wolf." The Board's conclusion as to motive is arbitrary and capricious as what they stated is opposite their own guidelines.

CCR § 2236 states:

"The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability. The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available and the refusal shall not be held against the prisoner [.] [E.A.]"

The evidence before this court shows the Board did use

33.

## II.

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(2 Cont.)

Petitioner's silence against him when they stated "we still do not have a clear understanding of why these crimes occurred [.]"

Further, in Irons -v- Warden of C.S.P. -Solano (E.D. Cal. 2005 ) 358 F.Supp. 2d 936 ,942 :

"The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial [CCR §2402 (c)(1)(E)] ... Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility. [E.A.]

Heretofore, motive has yet to establish Petitioner's Commitment Offense as "especially heinous, atrocious or cruel."

In Groppi -v- Leslie (1972) 404 US 496, 30 L.Ed 2d 632, 636, 92 S.Ct. 582 : "This Court has often recognized that the requirements of due process cannot be ascertained through mechanical application of a formula. See, e.g., Cafeteria Workers -v- McElroy, 367 US 886, 894-895, 6 L.Ed. 2d. 1230, 1235, 1236, 81 S.Ct. 1743 (1961) [.]" In Cafeteria Workers -v- McElroy (1961) 367 US 886, 6 L.Ed 2d 1230, 1236, 81 S.Ct 1743 :

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances ." It is "compounded of history, reason, and the past course of decisions ...."

Here, the Board's use of "motive" violated the 14th Amend. Due Process clause when violating procedural protections; under State law also.

34

III.

1 MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                                    3.

3      Petitioner contends that the Board's
4      conclusion about limited program
5      is a denial of the "Fundamental
       Fairness" doctrine as upheld in
6      Walters -v- Nat. Assn. of Radiation
7      Survivors (1985) 473 US 305, 105 S.Ct.
       3180, 3189.

8    In Walters -v- Nat. Assn. of Radiation Survivors (1985)

9  473 US 305, 87 L.Ed2d 220, 105 S.Ct. 3180, 3189:

10      "The very nature of the due process inquiry indicates
11      that the fundamental fairness of a particular
        procedure does not turn on the result obtained
12      in any individual case; rather, "procedural due
13      process rules are shaped by the risk of error
        inherent in the truth-finding process as
14      applied to the generality of cases, not the rare
15      exceptions."

16   The extensive record before this Board is that Petitioner

17  has programmed as assigned and as available.

18   Galland -v- City of Clovis (Cal 2001) 103 Cal. Rptr. 2d 711, 24 Cal.

19  4TH 1003: "[W]hen the process itself is fundamentally

20  unfair, even agency determinations supported by substantial

21  evidence may be overturned; it is the very unfairness

22  of the hearing that undermines the reliability of the

23  administrative record being reviewed."

24   Haas -v- County of San Bernardino (Cal. 2002) 119 Cal. Rptr. 2d

25  341, 346, 356:

26      "To summarize the governing principles, due
27      process requires fair adjudicators in courts            [cont.]

28

35

## VI.
MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(3 cont.)

and administrative tribunals alike ...[p.356] However, [t]he unfairness that results from biased decisionmakers strikes so deeply at our sense of justice, that it differs qualitatively from the injury that results from insufficient procedures."

As an unsuitability factor, CCR § 2402 (c)(6) states: "Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." On the other side of this equation, CCR § 2402(d)(9) as a suitability factor, states: "Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." During Petitioner's entire term-to-life incarceration he has shown ability to function within the law.

Here, the Board's statement of "The prisoner has, in terms of institutional behavior, programmed in a limited manner while incarcerated" is rote & ritualistic.

Here, the Board Panel was not impartial, and Petitioner has shown how the Board Panel prejudged limited program question by proving he has no disciplinaries for limited program. The record belies limited program.

Stivers -v- Pierce (9th Cir. 1995) 71 F.3d 732, 748: "We therefore hold that where one member of a tribunal is actually biased, the proceedings violate due process."

Petitioner has therefore proved how the B.P.H. panel violated "Fundamental Fairness" under 14th Amend. Due Process clause.

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES    CONTINUED

2          4.
3          Petitioner contends that the B.P.H.'s
   unsuitability rationale that the
4  record shows" you have not participated
   in beneficial self-help programs"
5  [Emphasis Added] is an abuse of
6  power by being arbitrary as held
7  in County of Sacramento -v- Lewis
8  (1998) 118 S.Ct. 1708, 1716, 523 US 833.

9    In order to deny parole, the B.P.H. panel and their
10  concurring review unit declared: "That you have not
11  participated in beneficial self-help programs." [E.A.]
12    As the "have not" decision is fact specific with an
13  absolute conclusion: Petitioner need only prove the
14  opposite that he has participated in beneficial self-
15  help programs. If Petitioner establishes by clear
16  and convincing evidence that the Board's conclusion
17  is false: minimally it is arbitrary.
18    In County of Sacramento -v- Lewis (1998) 118 S.Ct.
19  1708, 1716, 523 US 833  has held:
20    "We have emphasized time and again that "[t]he
21  touchstone of due process is protection of the
22  individual against arbitrary action of
23  government,"... Thus, in Collins -v- Harker
   Heights, for example we said that the Due
24  Process Clause was intended to prevent
25  government officials"'" from abusing [their]
   power or employing it as an instrument
26  of oppression.""'
27    In this case: the plain facts disprove the B.P.H. Panel.
28

## VI.
## MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
### (4 Cont.)

The B.P.H. has entitled CCR§2000 "Rules of Construction and Definitions". Nowhere in these definitions does the Board define beneficial self-help. In CCR§2410(b), the regulation talks about credits when participating in assignments and self-help. However, adding some illumination is CCR§2410(c)(2) which states in part:
"Participation in Self-Help and Rehabilitative Programs. All life prisoners are presumed to participate in programs for self-development (refer to CDC Rules 3040 and 3041). [Bold & Emphasis Added]

Therefore, by cross-reference, the important analysis of CCR§3040 is as follows:

¶(a) "Every able-bodied person ... is obligated to work as assigned ...." [E.A.]
¶(b) "Inmates assigned ...." [E.A.]
¶(c) "[C]ommittee shall assign ...." [E.A.]
¶(d) "Despite an inmate's assignment ...." [E.A.]
¶(e) "Inmates assigned ...." [E.A.]
¶(g) "Work assignments ...." [E.A.]

Notwithstanding CCR§3040, CCR§3041 provides for relevant analysis:

¶(a) "Inmates must perform assigned tasks ...." [E.A.]
¶(c) "Inmates must perform their work and program assignments ...," [E.A.]
¶(d) "Inmates assigned ...." [E.A.]
¶(e) "Inmates in assignments ...." [E.A.]

Contrary to the Board's analysis about "not" having participated in self-help: the record disproves them.

## VII.

### MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(4 Cont.)

Having disproved the Board's rote conclusion, Petitioner has established how the B.P.H. panel acted in an arbitrary manner by abusing their discretion.

Where In Re Rosenkrantz, supra, and In Re Dannenberg, supra mandate the Board obey their regulations in order to comply with due process: Petitioner has substantiated how the B.P.H. violated procedural due process protections guaranteed by the 14TH Amendment of the U.S. Constitution.

F.P.C. -v- Transcontinental Gas Pipe Line (1976) 96 S.Ct. 579, 582: "If the decision of the agency "is not sustainable on the administrative record made, then the ... decision must be vacated and the matter remanded ... for further consideration." Id.; at 143, 93 S.Ct. at 1244."

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                         5.

3       Petitioner contends that the use of
4  a +8 year old prison disciplinary is
5  beyond the scope of the B.P.H.'s
6  authority, of this disciplinary as a
7  parole unsuitability factor, in light
   of Greenholtz-v-Inmates of Neb. Penal
8  and Corr. Complex (1979) 442 US 1, 15, 99 S.Ct.
   2100 and restoration of credits lost by
9  another agency.

10      In Greenholtz-v-Inmates of Neb. Penal & Corr. Complex
11  (1979) 442 US 1, 15, 60 L.Ed.2d 668, 99 S.Ct. 2100: "[T]he behavior
12  record of an inmate during confinement is critical in
13  the sense that it reflects the degree to which the
14  inmate is prepared to adjust to parole release."
15      The one prison disciplinary was used to deny parole as
16  follows: "There was one serious disciplinary action, a 115,
17  in February of 1998 for Mutual Combat." This disciplinary
18  occurred during Petitioner's determinate term where punishment
19  was imposed, and credits forfeited and re-instated before the
20  term-to-life sentence started.
21      Minimally, under double jeopardy administrative
22  collateral estoppel doctrine: the Cal. Executive Branch of
23  Government should not be able to punish Petitioner twice
24  for one action.
25      This Court should also keep in mind that the
26  CCR §2402 (c)(6) "Institutional Behavior. The prisoner
27  has engaged in serious misconduct in prison or jail"
28

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
(5 Cont.)

cannot be read in isolation or contrary to statute.
Further, CCR§2402(d)(9), for suitability reads:
"Institutional Behavior. Institutional activities
indicate an enhanced ability to function within the
law upon release. All of this language was
filed 9-8-81 and effective 30 days later (History under
CCR§2400 etseq). This Court should be aware that this
CCR§§2402(c)(6)/2402(d)(9) language is verbatim
of CCR§§2281(c)(6)/2281(d)(9) respectively, as filed
7-31-78.

California Penal Code §2932(d) states in part, as
operative 7-1-77: "IF found guilty the prisoner
shall be advised in writing of the guilty finding
... and the amount of time-credit loss." [E.A.]
Notwithstanding Pen-Code§2932(d), supra, Pen. Code §2932
(e) states in part: "The prisoner shall be notified of...
the restoration of any credits previously forfeited." [E.A.]
Thus, nothing in Penal Code §2932 gives the B.P.H. the
ability to use restored credits after CDC restored
them under CCR§§3327 and 3328.

Also, in 64 Ops. Cal. Atty. Gen. 776 (1981 WL 126813)
as dated 10/9/81 by then Attorney General George
Deukmejian: "For a parole release date not to be set
at either an initial or subsequent parole hearing
on the basis of pending criminal or serious

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(5 Cont.)

disciplinary charges, the emphasized phrase [i.e.
gravity of current convicted offense or offenses, or the timing
and gravity of current or past convicted offense or offenses]
must be construed as referring to pending charges,
not to offenses for which the prisoner has been
convicted." NOTE: This opinion was 1 day after CCR§
2402 was in effect. Therefore, the B.P.H. is Bound
by the Attorney General's interpretation having
effect of law. Dannenberg/Rosenkrantz, supra, mandate procedure.

As the Board is fully aware of the California
Administrative Procedures Act (A.P.A.), as they
adopt, amend, rescind regulations; they know that
Gov't Code §§ 11340.5(a) and 11342.600 forbid them
from going beyond scope of regulation.

In Martin-v-Marshall (N.D. Cal. 2006) 5/17/06 ____
F.Supp. 2d ____ (2006 WL 1344584 (N.D. Cal.): "with respect
to petitioner's disciplinary violations [numerous 8 years
before hearing] there is significant evidence in the
record of Petitioner's positive institutional behavior,
which reasonably mitigates the effect that petitioner's
past violations have on his suitability for parole."

Therefore, Petitioner's procedural due process rights
have been violated by the Board's use of disciplinary
to deny his 14th Amend. "liberty" interest in parole. He was
not given process due as Morrissey-v-Brewer, passim, mandates

## VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2                          6.

3       Petitioner contends that the B.P.H.'s
4  use of Psych Report that was known to
5  be inaccurate (affecting risk assessment),
6  as a parole unsuitability circumstance,
7  and which was modified to a lower
8  assessment prior to finality of the
9  Decision, violated Due Process guarantee
   to fair decision as held in Arkansas
   -v- Oklahoma (1992) 112 S.Ct. 1046, 503 US
   592.

10  Arkansas -v- Oklahoma (1992) 112 S.Ct. 1046, 1060, 503
11  US 592 holds: "As we have often said an agency ruling
12  is 'arbitrary and capricious' if the agency has ... entirely
13  failed to consider an important aspect of the problem."
14      Under this point, the Board stated: "The psychiatrist's
15  Report ... is not totally supportive -- his violence risk
16  is slightly higher compared to the average citizen."
17      Before Petitioner elaborates on how the Psych Report is
18  in violation of Due Process, he Points out to this Court that
19  CCR § 2402 (c)(5), as a "Circumstance Tending to Show
20  Unsuitability", states: "Psychological Factors. The prisoner
21  has a lengthy history of severe mental problems related
22  to the offense." The record is entirely devoid of any
23  evidence to support CCR § 2402 (c)(5).
24      In light of Rosenkrantz/Dannenberg, supra, the
25  Board must adhere to their regulations.
26      CCR § 2402 (b) mandates: "All relevant, reliable
27  information available to the panel shall be considered[.]

28                          43

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
   (6 Cont.)
2      In this instant case, the B.P.H. panel was
3  explicitly advised by Petitioner's lawyer that the
4  Psych Report was inaccurate. However, the Board
5  chose to use it anyway instead of granting a new
6  hearing after new Psych Report during review
7  period : before hearing was final.
8      Here, where the Board refused to have a new
9  report for the Initial Parole Hearing, as mandated by
10 law, they "entirely failed to consider an important
11 aspect of the problem" as held in Arkansas -v-
12 Oklahoma, supra.
13     The Psych Report does not have to be "totally supportive".
14 It must has to establish that /support" the prisoner
15 will pose an unreasonable risk of danger to society
16 if released from prison" — CCR § 2402 (a). Here, the Psych
17 Report didn't support the B.P.H.'s conclusion.
18 Irons -v- Warden of C.S.P. -Solano (E.D.Cal. 2005) 358
19 F.Supp.2d 936, 942 : "[A] conclusion by lay B.P.T.
20 Commissioners, that petitioner has yet achieved required
21 therapy for insight or other reasons is not reasonably
22 sustainable [.]"
23     Based on the aforementioned, in light of a even
24 more favorable risk assessment, Petitioner's 14TH
25 Amendment liberty interest in parole has been
26 deprived by procedural due process being violated
27 when using Psych Report to support parole denial.
28

44

## VI.
MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

### 7.

Petitioner contends that the B.P.H.'s use of his prior alcohol and substance abuse is a violation of Due Process, due to the failure to follow its own procedures (Judicially determined) and therefore in violation of United States - v - Caceres ( ) 59 L.Ed 2d 733, 743 fn. 14, 440 US 741, 99 S.Ct 1465.

United States - v - Caceres ( ) 59 L.Ed 2d 733, 743 fn. 14 in part, 440 US 741, 99 S.Ct. 1465 has held:

"Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where internal procedures are possibly more rigorous than otherwise would be required. (Morton - v - Ruiz 415 US 199, 235, 39 L.Ed 2d. 270, 94 S.Ct. 1055)."

In this particular claim, Petitioner has been denied his 14th Amendment "liberty" interest in parole, in violation of procedural due process, when the B.P.H. panel claimed:

"And significant risk factors and precursors to violence are his past alcohol and substance abuse and a relapse would increase his risk of violence or undo gains he has made."

This was part of the Psych Report assessment specifically excepted to use to deny parole. This and any future court should keep in mind the Commissioner stating: "I will tell you that even absent the psychologist report that our finding would be the same." So, above rationale is refutable.

45

## VI.

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

(7 Cont.)

Clearly the Board has to obey their procedures (see In Re Rosenkrantz & In Re Dannenberg, supra). Thus, it must be the correct procedures as interpreted by the Courts.

In Re Earnest Smith (Cal. App. 6TH Dist. 2003) 114 Cal. App. 4TH 343, 371, ___ Cal Rptr 3d ___ :

"Smith's past desire for use of drugs does not by itself reasonably establish current unsuitability, because there is no additional evidence to complete a chain of reasoning between his past drug use and ... an unreasonable risk of danger if released."

Likewise, there is also no additional evidence in Petitioner's case.

In Re (Mack) Smith (2003) 109 Cal. App. 4TH 489, 505, 134 Cal. Rptr. 2d 781, 792 :

"[T]here is no evidence in the record to show that Smith is presently addicted to drugs ... While there is evidence that he used drugs and abused alcohol at the time of the murder, a prisoner's prior addiction is not an appropriate consideration in determining parole suitability."

So, if not appropriate, the Board shouldn't have used prior alcohol and substance abuse to deny parole.

Thompson - v - Davis (CA9 Cal. 2002) 295 F.3d 890, 898 (The Board may not deny parole based on a petitioner's history of substance abuse.) Minimally California must obey 9TH Circuit Precedent (see N.L.R.B. - v - Askenazy Property Management Corp. (CA9 1987) 817 F.2d 74, and Spraic - v - U.S. R.R. Retirement Bd. (CA9 1984) 735 F.2d 1708).

46

MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED
(¶ Cont.)

Therefore, both the California and Federal Judicial systems have plainly and clearly stated prior addiction/ use of substances is not a parole unsuitability circumstance.

Plainly, as substantiated by Petitioner, the B.P.H. has refused to adhere to: Walsh -v- Kirby (1974) 118 Cal. Rptr. 1, 8, 13 Cal.3d 95, 529 P.2d 33 holding of: "However, discretion cannot be exercised so as to "enlarge its own boundaries or support acts requiring other legal bases.", and Newman-v- Apfel (9TH Cir. 2000) 223 F.3d 937, 943: "The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds."

Whether independent and/or cumulative the B.P.H. / Psych decision to deny parole based on usage of substances is illusory to the point of being camouflage of a makeweight rationalization to deny parole.

The arbitrariness of this rationale is fully exposed when the trial record and Probation Report are devoid of any evidence of alcohol or controlled substance(s) being causitive factor for any offense which Petitioner stands convicted; although maintaining his innocence.

1 | <u>VI.</u>
MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2 | 8.

3 | Petitioner contends that the B.P.H.'s
4 | conclusion that "he still denies
5 | any responsibility for his crime" is
6 | a predisposition reflecting inability
7 | to render fair judgement (due to
8 | needed "soul-searching") as held
9 | violative of Due Process in <u>Liteky -v-</u>
10 | <u>U.S.</u> (1994) 114 S.Ct. 1147, 1155, 510 US
11 | 548 as it equates to "bias" or "prejudice".

10 | The B.P.H. panel substantiated the denial of parole, in
11 | part, when stating:

12 | " Although he has been disciplinary-free since
13 | his incarceration, <u>he still denies any</u>
14 | <u>responsibility for his crime and this</u>
15 | <u>evaluator feels that the inmate needs to do</u>
16 | <u>some soul-searching before being considered</u>
17 | <u>for release.</u>" [E.A.]

17 | First, "some soul-searching" is a non-quantifiable
18 | equation without any parameters. It is not a criteria
19 | for suitability/unsuitability. As "soul-searching" may
20 | connote religious forgiveness; this requirement would
21 | violate the "<u>establishment of religion</u>" clause of the 1st
22 | Amendment (see <u>Turner -v- Hickman</u> (E.D. Cal 2004) 342 F.Supp.
23 | 2d 887) and the "coercion test" forbidden in <u>Lee -v- Weisman</u>
24 | (1992) 505 US 577, 587, 112 S.Ct 2649, 120 L.Ed 2d 1467.) <u>Gillette -v-</u>
25 | <u>United States</u> (1971) 91 S.Ct. 828, 836: "[T]he central purpose of
26 | the Establishment Clause [is] the purpose of ensuring
27 | governmental neutrality in matters of religion."

28 | 48

VI.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2  (8 Cont.)

3  Regarding the aspect of "denies any responsibility,"

4  the B.P.H. intentionally disregarded Cal-Penal Code

5  §5011 (b)'s mandate of:

6      "The Board of Prison Terms shall not require,
7      when setting parole dates, an admission
8      of Guilt to any crime for which an inmate
       was committed."

9  In O'Bremski-v-Maass (9TH Cir. 1990) 915 F.2d 418,

10 422:

11     "Because parole board officials perform tasks
12     that are functionally comparable to those
       performed by the judiciary, they owe the
13     same duty: "to render impartial decisions
14     in cases or controversies that excite strong
       feelings because of the litigant's liberty
15     is at stake." [Cites omitted]... Thus, O'Bremski
16     is correct in his contention that he was entitled
17     to have a release date considered by a parole
       board that was free from bias or prejudice."
18     [E.A.]

19 Petitioner has these same protections as O'Bremski.

20 Wherein Petitioner has established that the B.P.H.

21 panel was predisposed to violate the law, he has

22 established that his 14TH Amendment "liberty" interest

23 in parole was violated by denying procedural due process.

24     Liteky-v-U.S. (1994) 114 S.Ct. 1147, 1155, 510 US 540:
25     "A favorable or unfavorable predisposition can be
       wrongful or inappropriate. A favorable or unfavorable
26     predisposition can also deserve to be characterized
       as "bias" or "prejudice"... [When] it is so extreme
27     as to display inability to render fair judgement."

28

49.

1  MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2  (8 Cont.)

3  Petitioner has shown to the contrary how the B.P.H.

4  panel did not judge the particular controversy (responsibility/

5  soul-searching) on valid circumstances. Withrow -v- Larkin

6  (1975) 421 US 35, 95 S.Ct. 1456, 43 L.Ed 2d 712, 728:

7  "Without a showing to the contrary, state
   administrators "are assumed to be men of

8  conscience and intellectual discipline

9  capable of judging a particular controversy

10 fairly on the basis of its own circumstances."
   United States -v- Morgan, 313 US 409, 421, 85 L.Ed.

11 1429, 61 S.Ct. 999 (1941)."

12 By refusing to adhere to the statutory and case law:

13 the B.P.H. evinced their intent, when abrogating and

14 obfuscating the law, to rule in an unconstitutional

15 manner.

16 Notwithstanding the aforementioned, "soul-searching" is also

17 covered by Pen. Code §5011 (b): as it is tentamount to admitting

18 guilt.

19

20

21

22

23

24

25

26

27

28

VII.

MEMORANDUM   OF   POINTS   AND   AUTHORITIES   CONTINUED

9.

Petitioner contends he was denied his right to an "impartial" panel, as guaranteed in Schweiker v. McClure (1982) 456 US 188, 72 L.Ed 2d 1, 102 S.Ct. 1665, when B.P.H. panel claimed "gains are recent" and need to "maintain gains" to support parole denial.

In the Calif. Code of Regulations, §2250 "A prisoner is entitled to a hearing by an impartial panel."

Schweiker v. McClure (1982) 456 US 188, 72 L.Ed 2d 1, 102 S.Ct. 1665 has also held:

"As this Court repeatedly has recognized, due process demands impartiality on the part of those who function in judicial or quasi-judicial capacity. E.g. Marshall v. Jerrico, Inc. 446 US 238, 242-243 and n.2, 64 L.Ed 2d 182, 100 S.Ct. 1610 (1980)."

Its unequivocal that B.P.H. panels act in quasi-judicial capacity. First, Petitioner is a 7-to-life prisoner, and not a 15-to-life or 25-to-life prisoner. Therefore his program to be suitable for parole occurs sooner not later.

Here, the Board Panel was not "impartial", when stating that: "The prisoner's gains are recent and he must demonstrate the ability to maintain gains over an extended period of time." [E.A.] The record before the Board disproves "recent" as petitioner has maintained gains his entire incarceration of 10 years.

Sinaloa Lake Owners Ass'n v. City of Simi Valley (9th Cir. 1989) 882 F.2d 1398, 1409, cert. denied Doody v. Sinaloa Lake Owners Ass'n,

5)

1   MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2   (9 cont.)

3   Inc., 494 US 1016, 110 S. Ct. 1317, 108 L.Ed 2d. 493 (1990):

4   "[M]alicious, irrational and plainly arbitrary

5   actions are not within the legitimate purview of the state's powers."

6   Tyson -v- City of Sunnyvale (N.D. Cal. 1986) 920 F.Supp. 1054, 1063:

7   "[S]ubstantive due process prevents ..."action that is

8   legally irrational in that it is not sufficiently keyed to

9   any legitimate state interests.""

10   In Stivers -v- Reece (9TH Cir. 1995) 71 F.3d 732, 741:

11   "There are two ways in which a plaintiff may

12   establish that he has been denied his constitutional

13   right to a fair hearing before an impartial tribunal.

14   In some cases, the proceedings and surrounding

15   circumstances may demonstrate actial bias on the part of the adjudicator.

16   Expanding on how to prove a member was impartial (biased),

17   Stivers, supra, at p.744:

18   "A party alleging unconstitutional bias may prove

19   this claim by introducing extrajudicial statements

20   by the adjudicator that are inconsistent with the

     role of an impartial decision maker."

21   Even "predisposition" can be "bias" (Liteky -v- U.S., supra,

22   at p.1155).

23   Here, based on the fictitious and absurd conclusion by

24   the B.P.H. panel, the panel was not impartial when

25   decision was infected with bias that was opposite to

26   truth, facts and legal duties. Thus, Petitioner's right to

27   "Due Process" was violated, by denying "liberty" interest in

28   parole that was not impartial.

## II.
## MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

10.

Petitioner contends that the rationale used by the Parole Board to impose multi-year denial was in violation of the Evitts-v-Lucey (1985) 105 S.Ct. 830, 838-39, 469 US 388 holding that even discretionary actions must comply with due process; thus, reasons used are invalid as proved violative of other U.S.S. Ct. holdings.

Petitioner adopts and incorporates the facts and points and authorities of Grounds 1-9 as these Grounds were all the same to impose the multi-year denial.

Based on each of the preceding 9 Grounds, he established how the B.P.H. violated procedural due process protections.

Evitts-v-Lucey (1985) 105 S.Ct. 830, 838-39, 469 US 388 has continued to hold:

"[A] State has great discretion in setting policies governing parole decisions, but it must nonetheless make those decisions in accord with Due Process Clause. [Cites omitted] In short, when a state opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with dictates of the Constitution — and in particular, in accord with the Due Process Clause."

In Re Edward Ramirez (Cal. App. 1st Dist. 2001) 114 Cal. Rptr. 2d 381 ras left unchanged by Dannenberg reversal on other question:
"The United States Supreme Court has made it clear that the "some evidence" standard discussed in Hill is only one aspect of judicial review for compliance with minimum standards of due process. In Edward's [cont.

1 | MEMORANDUM OF POINTS AND AUTHORITIES CONTINUED

2 | (10 Cont.)

3 | —v— Balisok (1997) 520 US 641 ... The court held
4 | that the scope of judicial review ... is not
5 | so creamed ... The court explained that
6 | the "some evidence" standard applies only
7 | to questions of evidentiary sufficiency. It
8 | is an additional requirement of due process,
   | nota substitute for other due process
   | requirements."

9 | Two years later, Biggs —v— Terhune (CA9 Cal. 2003) 334 F.3d
10 | 910, 2003 DJDAR 8863, 8874:

11 | "[T]he Parole Board must be cognizant not only
12 | of the facts required by state statute, to be
    | considered, but also concepts embodied in the
13 | Constitution requiring due process of law." [E.A.]

14 | Here, the B.P.H.'s chronology of reasons to support the
15 | multi-year parole denial was a ritualistic recipe
16 | of ingredients to bolster their decision. Worth repeating
17 | is the holding of Groppi —v— Leslie (1972) 30 L.Ed2d 632,
18 | 636, 92 S.Ct 582, 404 US 496, wherein:

19 | "This Court has often recognized that the
20 | requirements of due process cannot be
    | ascertained through mechanical application
21 | of a formula."

22 | Therefore, the imposed multi-year parole denial was
23 | illegally and unconstitutionally imposed when each
24 | reason used is violative of a U.S Supreme Court holding.
25 | Howlett By and Through Howlett —v— Rose (1990) 110 S.Ct 2430, 2438,
26 | 496 US 356: "The laws of the United States are laws in the several
27 | states, and just as much binding on the ... courts thereof as the
28 | State laws are."

54

## VII.
### CONCLUSION

Petitioner has established a prima facie case for relief, in light of having proven that:

A) Multiple victim rationale violated procedural due process as stated in Ground 1;

B) Motive rationale was used in a manner that violated procedural due process;

C) Petitioner's institutional behavior was not an unsuitability factor in a limited manner, in violation of procedural due process;

D) The conclusory allegation about not having participated in self-help is disproved rendering conclusion based on violation of due process;

E) His one serious disciplinary should not have been used to deny parole as it violated procedural due process;

F) Refusal to consider proper psych report violated procedural due process;

G) Petitioner's prior alcohol use / substance abuse is not / was not unsuitability criteria as use violated procedural due process;

H) The requirement of forced admission to crime and required soul-searching violated procedural due process;

I) He has established how the Board wasn't impartial when declaring recent gains as record established contrary making decision violative of procedural due process; and

J) Multi-year denial violated procedural due process.

Therefore, based on the aforementioned, Petitioner's 14TH Amendment liberty interest in parole was denied by the arbitrary and capricious actions of the Board of Parole Hearings' panel and Review Unit, when violative of the U.S. Constitution and contrary to law.

## VIII.
### PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays this Court to enter the following relief:

1) Issue the Writ of Habeas Corpus; or

2) Alternatively issue Order to Show Cause; and

3) Appoint Counsel; and

4) Order an Evidentiary Hearing and enter the attached exhibits into evidence; and

5) Vacate the B.P.H.'s entire decision and remand for a new hearing; and

6) Declare Petitioner's Due Process rights as violated; and

7) Order that the B.P.H. cannot use any of the grounds used unless evidence complies with Due Process;

8) Take Judicial Notice of Amended Psych Report at EXH "F";

9) Grant any other relief deemed Fair and in the interest of Justice including but not limited injunctive relief.

Respectfully submitted,

12/20/2006

JESSE HERNANDEZ

56



EXHIBIT "A"

SUMMARY: 2006 Parole Hearing Transcript

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )            CDC Number K-21116
                         )
JESSE HERNANDEZ          )          **INMATE**
                         )
_____ )           **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 26, 2006

PANEL PRESENT:

JAMES DAVIS, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

JESSE HERNANDEZ, Inmate
CHESTER PHILLIPS, Attorney for Inmate
SUSAN GUST, Deputy District Attorney (via
                              videoconference)
TWO CORRECTIONAL OFFICERS, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

Ramona Cota              Peters Shorthand Reporting

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 15 |
| Pre-Commitment Factors | 24 |
| Post-Commitment Factors | 36 |
| Parole Plans | 27 |
| Closing Statements | 55 |
| Recess | 64 |
| Decision | 65 |
| Adjournment | 73 |
| Transcriber Certification | 74 |

--oOo--

1

1          P R O C E E D I N G S

2          DEPUTY COMMISSIONER SMITH:  You are on

3     the record.

4          PRESIDING COMMISSIONER DAVIS:  Good

5     morning, Mr. Hernandez.

6          INMATE HERNANDEZ:  Good morning.

7          PRESIDING COMMISSIONER DAVIS:

8     Mr. Hernandez, this is an Initial Parole

9     Consideration Hearing for Jesse Hernandez, CDC

10    number K-21116.  Today's date is March 26, 2006,

11    we are located at the Correctional Training

12    Facility.  The inmate was received on 9/19/96

13    from San Diego County with a life term beginning

14    on 9/14/1999 with a minimum eligible parole date

15    of 9/14/2006.  The controlling offense for which

16    the inmate was received is attempted murder

17    first degree, case number SCE167745.  Additional

18    counts are a total of 22 PC use of a weapon,

19    same county same case number, possession of a

20    destructive device, 120303.2 PC, same county

21    same case number count two.  Attempt to burn,

22    455 PC, same county same case number count

23    three, and stalking, 646.9(a), same county same

24    case number, count six.  This hearing is being

25    tape-recorded and for the purposes of voice

26    identification we will each state our first and

27    last name, spelling your last name.  When it

2

1    comes to you, Mr. Hernandez, if you will also

2    give us your CDC number please sir.  And I will

3    start and move to my left, James Davis, D-A-V-I-

4    S, Commissioner.

5         DEPUTY COMMISSIONER SMITH:  My name is

6    Dennis Smith, S-M-I-T-H, I am a Deputy

7    Commissioner.

8         DEPUTY DISTRICT ATTORNEY GUST:  Susan

9    Gust, Deputy District Attorney, G-U-S-T.

10        ATTORNEY PHILLIPS:  Chester Phillips, I'm

11   defense attorney for Mr. Hernandez.  My last

12   name is spelled P-H-I-L-L-I-P-S.

13        INMATE HERNANDEZ:  Jesse Hernandez.  The

14   last name is H-E-R-N-A-N-D-E-Z.  My CDC number

15   is kilo 21116.

16        PRESIDING COMMISSIONER DAVIS:  And for

17   the record we also have two correctional

18   officers who are in the room with us today who

19   will not be participating in this hearing but

20   are here for security purposes only.  Before we

21   begin, Mr. Hernandez, you have in front of you,

22   in that laminated piece of paper should be the

23   Americans With Disabilities Act.

24        INMATE HERNANDEZ:  I do.

25        PRESIDING COMMISSIONER DAVIS:  If you

26   would read that aloud for me please sir.

27        INMATE HERNANDEZ:

3

1    "The Americans with Disabilities

2    Act, ADA, is a law to help people

3    with disabilities.  Disabilities

4    are problems that make it harder

5    for some people to see, hear,

6    breathe, talk, walk, learn, think,

7    work or take care of themselves

8    than it is for others.  Nobody can

9    be kept out of public places or

10    activities because of a

11    disability.  If you have a

12    disability you have the right to

13    ask for help to get ready for the

14    BPT Hearing, get to the hearing,

15    talk, read forms and papers and

16    understand the hearing process.

17    BPT will look at what you ask for

18    to make sure that you have a

19    disability that is covered by the

20    ADA and that you have asked for

21    the right kind of help.  If you do

22    not get help or if you don't think

23    you got the kind of help you need,

24    ask for a BPT 1074 Grievance Form.

25    You can also get help to fill it

26    out."

27    PRESIDING COMMISSIONER DAVIS:  Very good.

4

1   Mr. Hernandez, our records indicate that on the

2   1st of December in '05 you signed a Form 1073

3   from the Board of Parole Hearings indicating

4   that you do not need any assistance to

5   participate in this hearing, is that correct,

6   sir?

7        INMATE HERNANDEZ:  Could you repeat the

8   question again?  I'm sorry, I didn't hear that.

9        PRESIDING COMMISSIONER DAVIS:  On the 1st

10  of December in '05 you signed a form indicating

11  that you reviewed or one of your counselors

12  reviewed with you the Americans With

13  Disabilities Act and you indicated at that time

14  that you didn't have any disabilities that you

15  need assistance with.

16       INMATE HERNANDEZ:  I did so, I indicated

17  that.

18       PRESIDING COMMISSIONER DAVIS:  I see

19  you're wearing glasses today, sir.  Are they the

20  correct prescription for you and you're able to

21  read all your documents adequately?

22       INMATE HERNANDEZ:  Yes I am.

23       PRESIDING COMMISSIONER DAVIS:  All right.

24  I see also that you are participating in the

25  CCCMS.  What does that consist of, sir?

26       INMATE HERNANDEZ:  That consists of a

27  Benadryl, which was prescribed for me with the

5

1   recent passing of my mother to reinstate some

2   consistency with my sleep patterns.

3        PRESIDING COMMISSIONER DAVIS:  All right.

4   So you're taking that drug now?

5        INMATE HERNANDEZ:  I am taking that

6   prescription now.  Actually I haven't had any in

7   over a month now.

8        PRESIDING COMMISSIONER DAVIS:  Okay, you

9   anticipated my next question then.  So you

10  haven't had any in a month?

11       INMATE HERNANDEZ:  No.

12       PRESIDING COMMISSIONER DAVIS:  So you're

13  bright and alert today without any problems.

14       INMATE HERNANDEZ:  I am.

15       PRESIDING COMMISSIONER DAVIS:  All right.

16  You walked here under your own power?

17       INMATE HERNANDEZ:  Yes I did.

18       PRESIDING COMMISSIONER DAVIS:  And you

19  don't have any -- You're able to hear me all

20  right?

21       INMATE HERNANDEZ:  Yes I am, sir.

22       PRESIDING COMMISSIONER DAVIS:  Any

23  problems that you can think of whatsoever that

24  would interfere with you actively participating

25  in this hearing today?

26       INMATE HERNANDEZ:  None that I am aware

27  of at this point in time.

6

1          PRESIDING COMMISSIONER DAVIS:
2    Mr. Phillips, are you satisfied that your client
3    can participate in the hearing today?
4          ATTORNEY PHILLIPS:  Yes, I am.
5          PRESIDING COMMISSIONER DAVIS:  Very good.
6    This hearing is being conducted pursuant to
7    Penal Code Sections 3041 and 3042 and the rules
8    and regulations of the Board of Prison Terms
9    governing parole consideration hearings for life
10   inmates.  The purpose of the today's hearing is
11   to consider the number and nature of the crimes
12   you were committed for, your prior criminal and
13   social history and your behavior and programming
14   since your commitment.  We have had the
15   opportunity to review your File and you will be
16   given an opportunity to correct or clarify any
17   issues as we move along.  We will reach a
18   decision today and inform you whether or not we
19   find you suitable for parole and the reasons for
20   that decision.  If you are found suitable for
21   parole the length of your confinement will be
22   explained to you.  Before we go any further I
23   want to advise you that we expect you to be
24   totally honest with us today.  If you do not get
25   a date today this hearing will form the
26   foundation of all future hearings.  Any false
27   statements that you make could have an adverse

7.

1   effect on your ability to get a date in the
2   future.  Now what that means is today we're
3   setting a record today.  And so now is -- Today
4   is the day that if you want to make a change
5   someplace or if you have realized something that
6   you didn't say before, this is the time to do
7   it.  Does that make sense?
8            INMATE HERNANDEZ:  It makes sense.
9            PRESIDING COMMISSIONER DAVIS:  Okay.
10  Nothing that happens today will change the
11  finding of the court.  We are not here to retry
12  your case.  We are here to determine if you are
13  suitable for parole.  Do you understand that?
14           INMATE HERNANDEZ:  I understand that.
15           PRESIDING COMMISSIONER DAVIS:  All right.
16  This hearing is being, will be conducted in two
17  phases.  I will discuss with you the crime for
18  which you are committed, your prior criminal and
19  social history.  Commissioner Smith will discuss
20  with you your progress since your commitment,
21  your counselor's report, psychological
22  evaluation, parole plans and any letters of
23  support that might, that you might have.  Once
24  that is concluded the Commissioners and the
25  district attorney and your attorney will have an
26  opportunity to ask questions.  The questions
27  from the district attorney will be asked through

8

1    the panel and your answers should be directed
2    back to the panel.  Before we recess for
3    deliberations the district attorney, your
4    attorney and you will be given an opportunity to
5    make a final statement regarding your
6    suitability.  We will then recess to deliberate,
7    after which we will resume the hearing and
8    announce the decision.  The California Code of
9    Regulations states that regardless of time
10   served a life inmate shall be found suitable for
11   parole -- unsuitable for parole and denied
12   parole if in the judgment of the panel the
13   inmate would pose an unreasonable danger to
14   society if released from prison.  Can we take
15   just one minute?  This is just going to -- Can
16   we see if we can eliminate -- I'm concerned that
17   we may not be able to get a good recording.
18                    (Off the record.)
19         DEPUTY COMMISSIONER SMITH:  Okay, we're
20   back on.
21         PRESIDING COMMISSIONER DAVIS:  We're back
22   on.  All right, now so we've corrected the
23   technical difficulty with the heater here so
24   we'll be back, we are back on the record.  The
25   California Code of Regulations states that
26   regardless of time, regardless of time served
27   the life inmate shall be found unsuitable for

9

1    and denied parole if in the judgment of the

2    panel the inmate would pose an unreasonable risk

3    of danger to society if released from prison.

4    You have certain rights.  Those rights include

5    the right to a timely notice of all hearings,

6    the right to review your Central File and the

7    right to present relevant documents.

8    Mr. Phillips, are you satisfied that your

9    client's rights have been met for the purposes

10   of this hearing?

11          ATTORNEY PHILLIPS:  Yes your honor, yes.

12          PRESIDING COMMISSIONER DAVIS:  You have

13   an additional right to be heard by an impartial

14   panel.  Mr. Hernandez, you have heard Mr. Smith

15   and I introduced this morning.  Is there

16   anything -- Do you object to either one of us

17   hearing today?

18          INMATE HERNANDEZ:  I do not object to

19   either one of you at this hearing.

20          PRESIDING COMMISSIONER DAVIS:  Thank you.

21   You will receive a written copy of our tentative

22   decision today.  The decision becomes effective

23   within 120 days.  A copy of that tentative

24   decision and a copy of the transcript will be

25   sent to you and you will have 90 days from that

26   date to appeal if you so desire.  You are not

27   required to admit your offense or discuss your

10

1   offense.   However, this panel does accept the

2   findings of the court to be true.   And we've

3   already covered that but you understand that,

4   correct?

5           INMATE HERNANDEZ:   Yes sir.

6           PRESIDING COMMISSIONER DAVIS:   Thank you.

7   The Board has eliminated its appeal process.   If

8   you disagree with anything in today's hearing

9   you have the right to go directly to the court

10  with your complaint.   Commissioner Smith, do we

11  have any confidential information with which

12  we'll be dealing today?

13          DEPUTY COMMISSIONER SMITH:   There is no

14  confidential information in the file.

15          PRESIDING COMMISSIONER DAVIS:   Thank you.

16  Mr. Phillips, do you have any additional

17  documents that you wish to submit today?

18          ATTORNEY PHILLIPS:   Well I believe that

19  the Commissioners already have these documents

20  and if they do then I apologize for duplication.

21  These are laudatory chronos that we'd want to

22  submit.

23          PRESIDING COMMISSIONER DAVIS:   Those

24  should be in the Central File but we can make

25  sure that all of the ones that you have are the

26  same ones that we have.

27          ATTORNEY PHILLIPS:   Yes, they are in the

11

1   Central File, I verified that, but I just wanted

2   to make sure that those -- there are a total of

3   eight laudatory chronos and an additional two

4   laudatory work reports.

5           PRESIDING COMMISSIONER DAVIS:   Is that

6   it?

7           ATTORNEY PHILLIPS:   That's it, yes.

8           PRESIDING COMMISSIONER DAVIS:   District

9   Attorney Gust, did you have anything that you

10  want to submit today?

11          DEPUTY DISTRICT ATTORNEY GUST:   Nothing

12  additional.

13          PRESIDING COMMISSIONER DAVIS:   Okay.  We

14  do have a copy of a letter from Deputy District

15  Attorney Richard Sachs with an attached follow-

16  up investigative report.  It looks like a series

17  of investigative reports concerning this crime

18  that are dated 3/24/06 at 4 p.m.  If there are

19  no objections I will just go ahead and add those

20  to the documents that will be part of this

21  record.

22          ATTORNEY PHILLIPS:   No objection.

23          PRESIDING COMMISSIONER DAVIS:   I have a

24  list of the documents that we'll be covering

25  today.  Mr. Phillips, if you would like to look

26  at that list and see if that, see if you have,

27  make sure you have all those documents.

12

1        ATTORNEY PHILLIPS:  Yes, we have those

2    documents.

3        PRESIDING COMMISSIONER DAVIS:  All right,

4    we will be marking that Exhibit One.  And

5    Ms. Gust, I'm assuming that you also have those

6    documents.

7        DEPUTY DISTRICT ATTORNEY GUST:  Yes, I

8    believe we do have them.

9        DEPUTY COMMISSIONER SMITH:  Excuse me,

10   Commissioner, let me ask counsel.  If you have

11   these would you initial this for us, please.

12       ATTORNEY PHILLIPS:  Yes.  And you know, I

13   realized I was going to wait until we got into

14   the discussion of some of the particulars of the

15   documents that are contained in the Board's

16   information but I do have a couple of other

17   documents that I'll be offering.  I don't know

18   if you want me to offer those now or wait until

19   we get into the discussion about them.

20       PRESIDING COMMISSIONER DAVIS:  I think

21   we'd like to see what you have first.

22       ATTORNEY PHILLIPS:  Okay, all right, I'll

23   do that.

24       PRESIDING COMMISSIONER DAVIS:  Just

25   anywhere on the table is fine.

26       ATTORNEY PHILLIPS:  Anyplace?

27       PRESIDING COMMISSIONER DAVIS:  Yes.

13

1      **ATTORNEY PHILLIPS:**  Okay.  And today is

2  the 27th.  All right, there is that.

3      **DEPUTY COMMISSIONER SMITH:**  Thank you,

4  counsel.

5      **ATTORNEY PHILLIPS:**  And then what I have

6  is I have a copy of a letter that I wrote to

7  Bill Zika, who is the psychologist, who is the

8  supervising psychologist for the report that was

9  written and also a copy of the CDC form 602 that

10  Mr. Hernandez had submitted prior to that.  And

11  that's going to become more important when we

12  talk about the specific issues of the mental

13  evaluation.

14      **DEPUTY COMMISSIONER SMITH:**  Counsel, when

15  I review the psych evaluation I will then give

16  you and Mr. Hernandez the opportunity to make

17  any comments that you'd like to make regarding

18  that evaluation.  That would be the time, rather

19  than presenting the letters to us, to simply

20  verbally address those letters.

21      **ATTORNEY PHILLIPS:**  All right.

22      **DEPUTY COMMISSIONER SMITH:**  And if

23  Mr. Hernandez, as you indicated, has filed a 602

24  regarding the evaluation.

25      **ATTORNEY PHILLIPS:**  That's correct.

26      **DEPUTY COMMISSIONER SMITH:**  Then he can

27  simply make mention that a 602 has been filed

14

1   without going into any of the particulars.

2   Because we won't get involved in any 602

3   actions, that's between Mr. Hernandez and the

4   institution.  And we wouldn't want Mr. Hernandez

5   to say anything on the record or for us to place

6   anything on the record that could necessarily be

7   weighed either favorably or negatively in the

8   602 process.

9        ATTORNEY PHILLIPS:  Okay.

10       DEPUTY COMMISSIONER SMITH:  Okay?

11  Anything questions about any of my reasoning?

12       ATTORNEY PHILLIPS:  No.  No, we'll just

13  wait until we get to that, thanks.

14       DEPUTY COMMISSIONER SMITH:  Okay.

15       PRESIDING COMMISSIONER DAVIS:

16  Mr. Phillips, will Mr. Hernandez be speaking to

17  us today?

18       ATTORNEY PHILLIPS:  He will not be

19  discussing the offense.  We've talked about that

20  at length.  He understands that you, that the

21  conviction is there, that the convictions are

22  there, and that you will need to look at those

23  as decisions and not retry the case, just like

24  you were referring to earlier.  So he won't be

25  discussing the facts and circumstances around

26  the allegations as they came up back in 1995.

27       PRESIDING COMMISSIONER DAVIS:  But he may

15

1   be answering other questions?

2        ATTORNEY PHILLIPS:  Yes.

3        PRESIDING COMMISSIONER DAVIS:  In that

4   case I will go ahead and swear you in,

5   Mr. Hernandez.  If you'd raise your right hand

6   please sir.  Do you solemnly swear or affirm

7   that the testimony you will give at this hearing

8   will be the truth and nothing but the truth?

9        INMATE HERNANDEZ:  I do.

10       PRESIDING COMMISSIONER DAVIS:  All right.

11  And I am going to go to the Court of Appeals

12  Decision.  This is the Court of Appeals Fourth

13  Appellate District Division One State of

14  California dated April 14, 1998.  And beginning

15  on page three under the Factual and Procedural

16  Background it starts with a couple, actually

17  three footnotes on that one page.  The first

18  footnote as to the very top and the procedural

19  background.  The footnote states:

20        "We note Hernandez's opening brief

21        is defective under California

22        Rules of Court Rule 13 as it fails

23        to summarize the material facts

24        but rather recites a summary of

25        testimony witness to witness.  See

26        *Lord v. Henderson, 1951, 105 Cal.*

27        *App. 2d 426, 443 through 444.*

16

1        Nevertheless pursuant to

2        California Rules of Court Rule 18

3        we disregard the defect and

4        consider the brief as it was

5        properly prepared."

6  And it goes on to cite the specifics of this

7  case.

8        "Christine Wolf and Hernandez

9        cohabitated for two years until

10       early 1955 (sic).  They continued

11       to see each other even though Wolf

12       had moved in with Gary Tolle, T-O-

13       L-L-E, and Hernandez, H-E-R-N-A-N-

14       D-E-Z, was seeing Raquel McDowell,

15       capital M-C capital D-O-W-E-L-L.

16       In August Wolf moved in with her

17       grandmother, Jean Russell, R-U-S-

18       S-E-L-L.  Around the first of

19       November Wolf and Hernandez had a

20       heated argument over the phone.

21       Afterwards Hernandez paged Wolf so

22       many times she was forced to

23       deactivate her pager.  Wolf also

24       received anonymous threatening

25       phone calls but recognized

26       Hernandez's voice.  During

27       November Wolf received a letter

17

1          addressed to, quote, Chris, close
2          quotes --"
3   And at a footnote cited with number three it
4   says:
5          "Wolf testified Hernandez
6          frequently but not always
7          misspelled her name in this way."
8   Going back to the text.
9   "-- containing text cut from a magazine and
10  pasted on the paper.  Part of the note read,
11  quote, we guarantee you and --"
12  Then it cites a series of numbers.
13  "11-0-3-54, a friend will die, dot, dot, dot,
14  dot, now pay or play, 11-33-0-0.  Period, close
15  quotes."
16  And it also footnotes number four.
17          "Although they did not know each
18          other Hernandez began harassing
19          his neighbors, James and Julie
20          Sutton in late December.
21          Hernandez lived at 11330 El Nopal.
22          That's capital E-L capital N-O-P-
23          A-L.  And the Suttons lived three
24          doors away at 1154.  Following
25          police advice Wolf moved from
26          Russell's home.  Russell received
27          several phone calls after Wolf

18

1      moved.  On the morning of December

2      21 Julie Sutton discovered an

3      arrow from a crossbow,

4      parentheses, called a quote, bolt,

5      close quotes, close parentheses,

6      lodged in the door of her

7      daughter's bedroom as the child

8      slept.  The window had been

9      smashed and the curtain was torn.

10      They also found a gallon-size milk

11      jug containing gasoline on the

12      roof of Sutton's house.  Gasoline

13      had leaked from the jug through a

14      downspout and pooled beneath the

15      window.  A length of maroon velour

16      material protruded from the jug.

17      The fire investigator suspected it

18      was a sash from a bathrobe and was

19      intended to be a wick.  It had not

20      been lit.  The Suttons were

21      frightened and moved their motor

22      home in front of their children's

23      bedroom window.  On Christmas Eve

24      Julie Sutton's son brought her

25      another bolt he found stuck in the

26      ground.  He also found a bolt

27      lodged in the skin of the motor

19

1    home.  One near the kitchen window

2    and another in the ground, which

3    went through and tore the motor

4    home's windshield cover.

5    Sheriff's deputies canvassed the

6    neighborhood and discovered

7    another bolt lodged between the

8    shingles of the house two doors to

9    the west of the Suttons' house.

10   Later that night Russell was

11   awakened at her home by a, quote,

12   glow, close quotes, coming from

13   the area of the front door.  When

14   she opened the door she found a

15   passerby about to put out the fire

16   on the doorway with a garden hose.

17   An arson investigator believed the

18   fire was started with a bottle of

19   STP gas treatment.  Early in the

20   morning of January 3, 1996 Dan

21   Tolle went outside his home to see

22   why his dogs were barking.  He

23   found his son Gary's boat engulfed

24   in flames.  He put the flames out

25   with a hose and called the fire

26   department.  Fire investigators

27   determined that the fire was not

20

1    accidental.  Later that morning

2    Tolle's neighbor showed him a

3    suspicious package that he found

4    near Tolle's house and the boat.

5    The sheriffs were called.  This

6    package was found to contain a

7    cottage cheese and pineapple

8    container covered with a coffee

9    filter held down by medical tape.

10    Inside the container were two more

11    coffee filters holding smokeless

12    powder and shotgun pellets.  It

13    had a shoelace for a fuse.  Had

14    the shoelace been lit it probably

15    would have flared up sending

16    pellets a short distance.

17    Although dangerous it was

18    technically not an explosive

19    device.  Then on the afternoon of

20    January 6th twelve-year-old Tory

21    (phonetic) Tolle, T-O-L-L-E, Dan's

22    granddaughter and Gary's niece,

23    was watering the rose bushes in

24    front of Dan's house when she

25    heard a whistling sound next to

26    her head.  She turned to look in

27    the direction of the sound and saw

21

1      a bolt sticking out of the side of

2      the house.  It had missed her head

3      by only a few inches.  She then

4      saw a thin man with a mustache

5      wearing a black baseball cap and a

6      gray thermal shirt running down

7      the road away from the house.

8      Detective Myers, (phonetic) who

9      earlier had participated in the

10     investigation at the Suttons'

11     house investigated this incident.

12     Wolf later arrived at the Tolle

13     house and spoke to him.  He

14     noticed Tory and Wolf were similar

15     in height, weight and hair color.

16     Hernandez, the prime suspect in

17     the shooting, was found hiding on

18     the floor of his car, which

19     McDowell was driving.  Hernandez's

20     vehicle contained a receipt made

21     out to him with the address of the

22     Tolle home written on the back and

23     a tablet bearing the license plate

24     number of the Suttons and their

25     neighbors' car.  Next to

26     Mrs. Sutton's plate number was a

27     physical description which roughly

22

1    corresponded to her appearance.

2    As such -- Excuse me. A search of

3    Hernandez's home produced a box of

4    crossbows -- excuse me -- a box

5    for a crossbow which shot the type

6    of bolt found at the Sutton and

7    Tolle homes, coffee filters,

8    shotgun pellets, smokeless powder

9    and medical tape of the same type

10   as that used in the device found

11   near the Tolle home; a cottage

12   cheese and pineapple container in

13   the refrigerator, though of a

14   smaller size than that found at

15   the Tolle home, a maroon bathrobe

16   missing its sash, a gray

17   sweatshirt, a black baseball cap,

18   and a pile of empty one-gallon

19   milk jugs. No crossbow was ever

20   found. Hernandez denied owning a

21   crossbow. When he was confronted

22   with the box he claimed he was the

23   victim of a police conspiracy.

24   Hernandez was charged with twice

25   vandalizing the Suttons' home and

26   attempting to burn it, attempting

27   to murder Tory, possessing a

23

1          destructive device found near the
2          Tolle home and stalking Christine
3          Wolf.  He was not charged with
4          making harassing phone calls, the
5          boat burning or burning
6          Mrs. Russell's door."
7    Let me start that again.  The sentence is:
8          "He was not charged with making
9          harassing phone calls, the boat
10         burning or burning Mrs. Russell's
11         door.  The fingerprints were found
12         on the handwritten -- His
13         fingerprints were found on the
14         handwritten note with the license
15         numbers, the envelope of the
16         letter sent to Wolf, the crossbow
17         box and the cottage cheese
18         container found near the Tolle
19         home.  He presented an alibi
20         defense but did not testify."
21   Mr. Hernandez, do you know any of the sheriff's
22   deputies or any of the law enforcement officials
23   that were associated with your case?
24         INMATE HERNANDEZ:  I won't be discussing
25   any parts of this crime or any elements of the
26   crime.  That would include the individuals
27   responsible for the investigation.

24

1          PRESIDING COMMISSIONER DAVIS:  Okay.  So

2     you don't want to, you don't even want to say if

3     you knew the officers or not?

4          INMATE HERNANDEZ:  I will not be

5     participating in this.

6          PRESIDING COMMISSIONER DAVIS:  Okay.

7     Let's move on.  In terms of your personal

8     history significant family information I'm

9     referring here to page ten in the legal

10    documents.  And I believe this is the parole

11    officer's report.  It says, this 38-year-old

12    defendant was born in San Antonio, Texas but has

13    resided in San Diego County since age four.  He

14    never knew his natural father and his mother

15    remarried when he was eight years old to Ernest

16    Palensky, P-A-L-E-N-S-K-Y.  He is the oldest of

17    seven children and considers his childhood and

18    upbringing as good.  He did not experience any

19    abuse and was not exposed to substance abuse in

20    his family.  No criminal history in the family

21    according to this report.  In terms of

22    education, graduated from Santana High School

23    where he was the sophomore class president and

24    was the California state wrestling champion in

25    his weight class.  In terms of prior employment,

26    he has been employed as a floor-covering

27    contractor for the last 12 years and was a

25

1   member of the San Diego Floor Covering

2   Association for the past four years.  Prior to

3   the instant offense his business was in

4   financial problems and he had $10,000 worth of

5   unrecoverable funds outstanding.  In October

6   1995 he began to work with his girlfriend's

7   animal lab.  You had at the time a six-year-old

8   daughter that resided with her mother.  Is that

9   still correct?  How old is your daughter now,

10  sir?

11          INMATE HERNANDEZ:  Yesterday my daughter

12  turned 17.

13          PRESIDING COMMISSIONER DAVIS:  And she's

14  still living with her mother?

15          INMATE HERNANDEZ:  That's correct.

16          PRESIDING COMMISSIONER DAVIS:  Joined the

17  United States Army in 1977 and spent nine months

18  in the 82nd Airborne Division.  However, on his

19  thirteenth jump hurt his back and did not want

20  to simply sit at a desk for the next year.

21  Therefore he took a discharge by waiving his

22  medical and did not qualify for VA benefits.  At

23  the time you had been married and divorced three

24  times.  The first marriage ending in divorce due

25  to the fact that both of them were too young.

26  The second divorce involved a woman 13 years his

27  senior who the defendant divorced due to alcohol

26

1   problems.  His third marriage was Rhonda -- Is

2   that Heindly, H-E-I-N-D-L-Y, Heindly?  How do

3   you pronounce that, Mr. Hernandez?

4        INMATE HERNANDEZ:  That's what the last

5   name is on this information but to be honest

6   with you I don't recall her maiden name.

7        PRESIDING COMMISSIONER DAVIS:  Okay.  It

8   lasted about seven years, after which they

9   divorced in 1992.  He states that he had become

10   a workaholic during his marriage and that there

11   was one incident of domestic violence with

12   Rhonda.  According to this it says that alcohol

13   had never been a problem for you, that you

14   smoked marijuana about six times in high school.

15   In late 1991 until '94 began using

16   methamphetamine and described your use as very

17   mild.  Stated he began using the substance about

18   every other weekend when he met Christine Wolf

19   and for a six month period, for a six month

20   period prior to their breakup in 1995 he was

21   using the substance about every two or three

22   days.  Does that sound about accurate as far as

23   your recollection of your use of alcohol or

24   drugs?

25        INMATE HERNANDEZ:  I stipulate to the

26   probation officer's report.

27        ATTORNEY PHILLIPS:  Okay.

27

1       PRESIDING COMMISSIONER DAVIS:   In terms

2   of -- denies any gang affiliation.   It says, the

3   defendant stated that he had never spent any

4   time in jail before the instant offense and had

5   always lived a productive life.   In fact he has

6   received commendations from various

7   organizations.   He donated labor and floor

8   covering materials to organizations like the

9   battered women's shelter in Escondido, the

10   Santee Little League and something called H-O-M.

11   What is H-O-M?

12       INMATE HERNANDEZ:   That would be the

13   House of Metamorphosis.

14       PRESIDING COMMISSIONER DAVIS:   Oh, house,

15   okay.

16       INMATE HERNANDEZ:   It's a drug rehab

17   facility that contacted me in regards to re-

18   covering their entire facility.

19       PRESIDING COMMISSIONER DAVIS:   In

20   downtown San Diego.

21       INMATE HERNANDEZ:   It is, sir.

22       PRESIDING COMMISSIONER DAVIS:   Yes.   And

23   how did they come to contact you?

24       INMATE HERNANDEZ:   A vendor of mine had

25   actually approached me.   They had called him for

26   some services and he was unable to provide those

27   services in a lucrative manner and he wasn't in

28

1   any position to donate any materials or labor.

2   He approached me in regards to that.  I at that

3   time took it upon myself to meet the organizer.

4   Doris was doing an admirable job in her pursuit

5   to rehabilitate and to provide a better, safe

6   home so I donated enough material to carpet both

7   the male and female dorms, the administration

8   area and the stairwell.

9        PRESIDING COMMISSIONER DAVIS:  Okay.  But

10  it's strictly a business contact.

11       INMATE HERNANDEZ:  It was strictly a

12  business contact, yes sir.

13       PRESIDING COMMISSIONER DAVIS:  Okay.  So

14  you said you stipulated to the report.  Is there

15  anything that doesn't sound right to you or that

16  you want to add or amplify?

17       INMATE HERNANDEZ:  As I've said, I just

18  stipulate to the report as it sits right now.

19       PRESIDING COMMISSIONER DAVIS:  Okay.  Was

20  the use of -- Did methamphetamine become a

21  problem for you when you were using it as it

22  says here every two or three days?

23       ATTORNEY PHILLIPS:  I don't know if he is

24  in a position really to answer that question and

25  I would advise him not to answer.

26       PRESIDING COMMISSIONER DAVIS:  Okay.  All

27  right, then I'll ask you to turn your attention

29

1    to Commissioner Smith.

2        DEPUTY COMMISSIONER SMITH:

3    Mr. Hernandez, I am going to comment on your

4    employment plans, the residential plans and go

5    through the letters.  And then I'll go back and

6    do a review of the adjustment, of your

7    institutional adjustment, and then I'll finish

8    up with the psychological evaluation.  Regarding

9    plans, referring to the Board report indicates

10   that you lived with your mother, Sophia

11   Palensky, P-A-L-E-N-S-K-Y, and your sister Susan

12   Jarcki, J-A-R-C-K-I.  Did I understand you to

13   say earlier that your mother has recently passed

14   away?

15        INMATE HERNANDEZ:  Yes sir, she has, she

16   passed in August of last year.

17        DEPUTY COMMISSIONER SMITH:  Okay, our

18   sympathies.

19        INMATE HERNANDEZ:  Thank you sir.

20        DEPUTY COMMISSIONER SMITH:  So your plans

21   would be to live with your sister then still?

22        INMATE HERNANDEZ:  Yes sir.  She would --

23   she provided a letter.  It's dated August 31st.

24        DEPUTY COMMISSIONER SMITH:  And I'll

25   address that.

26        INMATE HERNANDEZ:  Okay.

27        DEPUTY COMMISSIONER SMITH:  I know that

30

1    it's in here but I just wanted to --

2              INMATE HERNANDEZ:  Okay.

3              DEPUTY COMMISSIONER SMITH:  -- to

4    clarify.

5              INMATE HERNANDEZ:  Thank you sir.

6              DEPUTY COMMISSIONER SMITH:  And I don't

7    mind your helping me out.

8              INMATE HERNANDEZ:  Thank you sir.

9              DEPUTY COMMISSIONER SMITH:  Okay?

10             INMATE HERNANDEZ:  Thank you very much.

11             DEPUTY COMMISSIONER SMITH:  And your

12   sister is married so the letter is both from she

13   and her husband Jim, correct?

14             INMATE HERNANDEZ:  Yes sir.

15             PRESIDING COMMISSIONER DAVIS:  Okay.  And

16   with regard to employment it says that you plan

17   on working as a flooring carpeter or in small

18   engine repair.  When I again get to the letter

19   from your sister and her husband they're talking

20   about a different type of employment; is that

21   right?

22             INMATE HERNANDEZ:  They were talking

23   about construction employment, yes sir.

24             DEPUTY COMMISSIONER SMITH:  Okay.  So

25   what's your long-range plan?

26             INMATE HERNANDEZ:  My long-range plan

27   would be to begin work with my brother-in-law in

31

1   any aspect --

2       DEPUTY COMMISSIONER SMITH:   Your brother-

3   in-law is Jim Jackie (sic).

4       INMATE HERNANDEZ:   Jim Jarcki, yes sir.

5       DEPUTY COMMISSIONER SMITH:   Jim Jarcki.

6       INMATE HERNANDEZ:   In any possibility

7   that is necessary.   I mean, I have a great deal

8   to offer from the floor covering standpoint.   He

9   is a general contractor and as such provides all

10  aspects of the building of a home from the

11  ground up.   So it could be in just about any,

12  any of the fields that he would be responsible

13  for.

14      DEPUTY COMMISSIONER SMITH:   Okay, thank

15  you.   You have numerous letters and I am going

16  to do a kind of a summary overview of the

17  letters.

18      INMATE HERNANDEZ:   Okay.

19      DEPUTY COMMISSIONER SMITH:   In the Board

20  packet there are some letters that had been

21  placed in the packet several times so obviously

22  I'm going to try and avoid the duplication.

23  There are also numerous letters that are dated

24  ten years old and over.   A number of them back

25  in at least 1996.   And I am not going to review

26  those letters.   One, obviously the letters are

27  at least ten years old and secondly they are

32

1  from a lot of the same individuals that we have

2  more current letters from.  However, if there is

3  some particular letter that you want to make

4  sure, even if it's somewhat dated, that you want

5  to make sure we get on the record I'd be happy

6  to do that, okay.  A letter from Rebecca

7  Palensky, P-A-L-E-N-S-K-Y.  She is your step-

8  niece.  Is that right?

9      INMATE HERNANDEZ:  No, she would be my

10  niece.

11      DEPUTY COMMISSIONER SMITH:  Okay.

12  Because she says she is writing on behalf of her

13  step-uncle so I just made the assumption that

14  she was a step-niece.  But you consider --

15      INMATE HERNANDEZ:  Yeah.  Her father and

16  I grew up, you know, together as children and I

17  never really consider him a stepbrother.

18      DEPUTY COMMISSIONER SMITH:  Okay.  You

19  don't consider her your step-niece.

20      INMATE HERNANDEZ:  I don't, I don't sir.

21      DEPUTY COMMISSIONER SMITH:  Okay, okay.

22  She writes a very positive letter and she

23  supports your being granted parole at this

24  hearing.  A letter from Susan and Jim Jarcki.

25  I'm pronouncing that right this time?

26      INMATE HERNANDEZ:  Yes sir you are.

27      DEPUTY COMMISSIONER SMITH:  J-A-R-C-K-I.

33

1        INMATE HERNANDEZ:  Yes sir.

2        DEPUTY COMMISSIONER SMITH:  And she is

3    your sister.  And in the letter they said they'd

4    provide you with a full time job as a laborer.

5    That you would be paid $17 an hour for a 40 hour

6    week and that they would also provide you with a

7    place to live in their home where they currently

8    have three empty bedrooms.  It goes on to

9    discuss their involvement in the church in the

10   area and strongly support you being granted

11   parole.  There's a letter that's copied that's

12   from an individual whose signature was removed.

13   It's dated September 2005.  It says, Jesse grew

14   up next door to me and my wife until his late

15   teens.  When he moved his mother and other

16   children were my neighbors for 30 years.  The

17   person's home will be open to you until you get

18   your life back in order.  And it looks like

19   maybe a Peterson (phonetic).

20       INMATE HERNANDEZ:  Yes sir.  That would

21   be Pete Peterson.  He was our neighbor for many

22   years growing up.

23       DEPUTY COMMISSIONER SMITH:  Okay.  I was

24   guessing at the Peterson part because I only had

25   the top half.

26       INMATE HERNANDEZ:  That was a good guess

27   sir.

34

1          DEPUTY COMMISSIONER SMITH:    A letter from

2    Linda Cabral, C-A-B-R-A-L, who is an ex-spouse.

3          INMATE HERNANDEZ:    Yes sir

4          DEPUTY COMMISSIONER SMITH:    And she

5    writes.    And she indicates that she would not

6    hesitate in opening her home to you for a place

7    to live and help you in any way that she could

8    in assisting you with employment.    A letter from

9    a Nicole Parker, P-A-R-K-E-R, who lives in

10    Montana.    Indicates that she has known you for

11    some 25 years and has always known you to be

12    soft-spoken and a kindhearted individual and

13    supports you being granted parole at this time.

14    There's another letter from Susan Jarcki that is

15    primarily a transmittal letter and it includes a

16    number of other letters with it.    One is

17    September of 2002 from a Myrna Lawson, L-A-W-S-

18    O-N, who is also a sister.

19          INMATE HERNANDEZ:    Yes sir.

20          DEPUTY COMMISSIONER SMITH:    And she

21    indicates that she is writing on behalf of her

22    brother.    She talks about, you know, the trial

23    and the shock that they felt regarding the

24    outcome and ask that you be strongly considered

25    for parole at this time.    And then we get into

26    letters from 1996, again from your sister, from

27    a William and Rae Weidner (phonetic), from a

35

1    Janice Hernandez.  From, it appears to be a

2    Rhonda Hendry perhaps.

3         INMATE HERNANDEZ:  That would be Rhonda

4    Hernandez.  That's my, an ex-wife.

5         DEPUTY COMMISSIONER SMITH:  Okay.

6         INMATE HERNANDEZ:  And for the record her

7    last name was Draggo.  We spoke about that

8    earlier.

9         DEPUTY COMMISSIONER SMITH:  Okay.  You

10   want to spell that?

11        INMATE HERNANDEZ:  Actually I think it

12   was D-R-A-G-G-O.

13        DEPUTY COMMISSIONER SMITH:  Okay, thank

14   you.  A letter from Candice Hernandez.  And

15   again most of these letters or all these letters

16   are all back from 1996.  And unless there's one

17   that is specific that you would like to have

18   identified for the record, because of the fact

19   that it's ten years old.  But obviously we're

20   more concerned with a current letter of support

21   than the history.  I'm not going to go into

22   those.  Anything that you would like to add

23   regarding your parole plans before I go to your

24   adjustment?

25        INMATE HERNANDEZ:  Not at this time.

26        DEPUTY COMMISSIONER SMITH:  Okay.  If you

27   or counsel should think of something and want to

36

1   make mention as the hearing goes on we'll

2   certainly give you that opportunity.

3           INMATE HERNANDEZ:  Thank you very much.

4           DEPUTY COMMISSIONER SMITH:  According to

5   the C File you were received by the Department

6   of Corrections on September 19, 1996.  Received

7   here at CTF on October 6 of 2004.  You have a

8   classification score of 19, which is the lowest

9   classification score a life inmate can attain.

10  This is your initial hearing.  It's already been

11  commented on.  You have had an exceptional

12  disciplinary history.  Since you have been in

13  custody you have had no CDC 128(a)s and only one

14  CDC 115.  That was in February of 1998 for

15  mutual combat.  And this panel recognizes how

16  difficult it is to establish a positive or an

17  exceptional disciplinary history.  It's often

18  very easy to get a write-up through not

19  necessarily any individual's own fault or

20  actions but on occasion just simply being in the

21  wrong place at the wrong time.  But certainly

22  your having only one 115 in nearly ten years is

23  something that you're to be congratulated for.

24  And we don't say that in any kind of a mild way,

25  we're sincere.

26          INMATE HERNANDEZ:  Thank you sir.

27          DEPUTY COMMISSIONER SMITH:  You received

37

1  eight laudatory chronos.  In May of 1999 for

2  your being a valuable asset to the vocational

3  assignment that you were in and I'll address

4  that assignment in just a moment.  Another one

5  in October of '99 regarding your excellent work

6  habits in your work assignment.  Another one in

7  September of 2004 also having to do with your

8  positive work in your work assignment.  August

9  2005 for your work assignment as a clerk.

10  September of 2005 your completion of a 12 week

11  program in a Christian Basic class.

12         INMATE HERNANDEZ:  Yes.

13         DEPUTY COMMISSIONER SMITH:  What's the

14  Christian Basic class.  I have seen a lot of

15  various programs at different institutions but

16  I'm not familiar with that one.

17         INMATE HERNANDEZ:  This was an

18  established 12 week course that unfortunately

19  took 23 weeks to complete due to circumstances

20  beyond our control concerning institutional

21  security and things of that nature.  However, it

22  focused on memorizing certain, certain ideas in

23  the Bible as in regards to understanding our

24  anger, our reaction and forgiveness most of all.

25  It was a -- It was a very interesting course

26  that was provided and I have since signed up and

27  am waiting to attend the next version of that

38

1    same course.

2          DEPUTY COMMISSIONER SMITH:  So you're on

3    the waiting list then for that?

4          INMATE HERNANDEZ:  I am.  Actually I've

5    received two ducats for Thursday evening which

6    incorporates anger management and --

7    Unfortunately the first course has not taken

8    place.

9          ATTORNEY PHILLIPS:  Date?

10          INMATE HERNANDEZ:  Yeah, the first date

11   hasn't taken place just because of the lock down

12   of the institution.

13          DEPUTY COMMISSIONER SMITH:  Okay.  And we

14   certainly understand the difficulty in

15   attending, you know, some programs for any

16   number of reasons.

17          INMATE HERNANDEZ:  Yes sir.

18          DEPUTY COMMISSIONER SMITH:  A laudatory

19   chrono also December 2005 for your work in the

20   culinary in providing Thanksgiving meals.  One

21   in July of 2000 for your work in the small

22   engine repair program, basically as a lead man,

23   mentor, tutor, right?

24          INMATE HERNANDEZ:  Yes sir, that's

25   correct.

26          DEPUTY COMMISSIONER SMITH:  And then most

27   recently January of this year for your work

39

1    effort in your current work assignment, which is

2    as a general education clerk.

3         INMATE HERNANDEZ:  Yes sir.

4         DEPUTY COMMISSIONER SMITH:  And you've

5    also been assigned to business education and as

6    an R&R clerk.

7         INMATE HERNANDEZ:  For two years, yes

8    sir.

9         DEPUTY COMMISSIONER SMITH:  You completed

10   the small engine repair vocation.  That was in

11   January of '99.  You completed, you received a

12   certificate of completion in clerk training

13   March of 2002.  And the Board report indicates

14   that you have been in treatment under CCCMS

15   since '96, is that right?  Because the

16   psychological evaluation says it was more recent

17   as the result of your mother's passing.  Has it

18   been off and on?

19        INMATE HERNANDEZ:  That's correct, that's

20   correct.  I really have not been on any

21   psychological meds in quite some time.  It was

22   an antidepressant and again, that was quite a

23   while ago.

24        DEPUTY COMMISSIONER SMITH:  Let me turn

25   the tapes.

26             (The tape was turned over.)

27        DEPUTY COMMISSIONER SMITH:  We're on side